Jonathan TASINI, Mary Kay Blakely, Barbara Garson, Margot Mifflin, Sonia Jaffe Robbins, and David S. Whitford, Plaintiffs,

v.

The NEW YORK TIMES CO., Newsday Inc., Time Inc., The Atlantic Monthly Co., Mead Data Central Corp., and University Microfilms Inc., Defendants.

No. 93 Civ. 8678(SS).

United States District Court, S.D. New York.

Aug. 13, 1997.

Emily M. Bass, Burstein & Bass, New York City, for Plaintiffs.

Bruce P. Keller, Lorin L. Reisner, Thomas H. Prochnow, Debevoise & Plimpton, New York City, for Defendants.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

In this action, the Court is called upon to determine whether publishers are entitled to place the contents of their periodicals into electronic data bases and onto CD–ROMs without first securing the permission of the freelance writers whose contributions are included in those periodicals. According to the Complaint, filed by a group of freelance journalists, this practice infringes the copyright that each writer holds in his or her individual articles. The defendant publishers and electronic service providers respond by invoking the "revision" privilege of the "collective works" provision of the Copyright Act of 1976, 17 U.S.C. § 201(c). Defendants maintain that they have not improperly exploited plaintiffs' individual contributions, but that they have permissibly reproduced plaintiffs' articles as part of electronic revisions of the newspapers and magazines in which those articles first appeared. For the reasons to be discussed, the Court agrees with defendants, and grants summary judgment in their favor.

### BACKGROUND

Plaintiffs are six freelance writers who have sold articles for publication in a variety of popular newspapers and magazines, including *The New York Times, Newsday, and Sports Illustrated.* The first two of these periodicals, published respectively by defendants *The New York Times Company and Newsday, Inc.,* are daily newspapers widely circulated to subscribers and newsstands. *Sports Illustrated,* published by the defendant Time, Inc. ("Time"), is a weekly magazine featuring articles and commentary of particular interest to sports enthusiasts. In addition to circulating hard copy versions of their periodicals, the defendant publishers sell the contents of their publications to the remaining defendants—University Microfilms Inc. (now called UMI Company ("UMI")) and The MEAD Corporation (now called LEXIS/NEXIS ("MEAD"))—for inclusion in assorted electronic data bases.[1]

MEAD owns and operates NEXIS, an online, electronic, computer assisted text retrieval system in which articles from a number of leading newspapers, newsletters, magazines, and wire services—including *The New York Times, Newsday, and Sports Illustrated*—are displayed or printed in response to search requests from subscribers. (Pl.s' Mot. Summ. J. Ex. 49 at MO 1464.) UMI produces and distributes two CD–ROM products identified by plaintiffs in their Amended Complaint. One of these products, "The New York Times OnDisc," operates in much the same manner as NEXIS, and is made up of the articles appearing in each issue of *The New York Times.* The remaining CD–ROM, "General Periodicals OnDisc," provides a full image-based reproduction of *The New York Times Book Review and Sunday Magazine.*

Plaintiffs move for summary judgment on their claims of copyright infringement contending that the electronic reproductions of their articles are improper under the Copyright Act. Defendants Time and Newsday move for summary judgment on the ground that plaintiffs entered into contracts authorizing these publishers to sell plaintiffs' articles to the electronic defendants. All of the defendants argue that, even in the absence of such agreements, dismissal of this action is warranted because the publisher defendants properly exercised their right, under the Copyright Act, to produce revised versions of their publications.

#### A. The Parties' Relationship

The six plaintiffs claim that defendants infringed their copyrights in a total of 21 articles sold for publication between 1990 and 1993. Twelve of these articles, written by plaintiffs Tasini, Mifflin, and Blakely, appeared in *The New York Times.* Another eight of the articles, by plaintiffs Tasini, Garson, Whitford, and Robbins, were featured in *Newsday.* The remaining article, a piece entitled "Glory Amid Grief" by plaintiff Whitford, appeared in an issue of *Sports Illustrated.* All of the plaintiffs wrote their articles on a freelance basis, and not as employees of the defendant publishers.

---

1. Plaintiffs have settled their claims against the defendant Atlantic Monthly.

## 1. *The New York Times*

As of the time this action was commenced, freelance assignments for *The New York Times* were typically undertaken pursuant to verbal agreements reached between the newspaper and the contributing journalists. A New York Times editor and a selected freelance writer ordinarily agreed upon such matters as the topic and length of a particular piece, the deadline for submission, and the fee to be paid. (Keller Dec. Ex. B7.) These discussions seldom extended into negotiations over rights in the commissioned articles. Indeed, there were no such negotiations between The New York Times and any of the plaintiffs, all of whom submitted their articles for publication by The New York Times without any written agreements.[2] *Id.*

## 2. *Newsday*

Prior to this action, Newsday solicited its freelance contributions in much the same manner as did The New York Times. Freelance assignments for Newsday were most often undertaken pursuant to discussions between editors and writers and without any written agreements. (Keller Dec. Ex. B2.) However, the checks with which Newsday paid freelance writers for their contributions, including those checks sent to plaintiffs following the publication of their articles, included the following endorsement:

> Signature required. Check void if this endorsement altered. This check accepted as full payment for first-time publication rights (or all rights, if agreement is for all rights) to material described on face of check in all editions published by *Newsday* and for the right to include such material in electronic library archives.

(Pl.s' Mot. Summ. J. Ex. 47.) Plaintiff Tasini crossed out this notation prior to cashing those checks paying him for his two disputed submissions to Newsday. Those plaintiffs who wrote the remaining six *Newsday* articles cashed their checks with the notation intact.

## 3. *Sports Illustrated*

Only plaintiff Whitford submitted an article for publication in *Sports Illustrated*. The relationship between Time and Whitford was decidedly more formal than the arrangements routinely entered into between freelance writers and Newsday or The New York Times. Whitford and *Sports Illustrated* entered into a written contract specifying the content and length of the purchased article, the date due, and the fee to be paid by the magazine. The contract also provided *Sports Illustrated* "the following rights":

> (a) the exclusive right first to publish the Story in the Magazine:
>
> (b) the non-exclusive right to license the republication of the Story whether in translation, digest, or abridgement form or otherwise in other publications, provided that the Magazine shall pay to you fifty percent (50%) of all net proceeds it receives for such republication: and
>
> (c) the right to republish the Story or any portions thereof in or in connection with the Magazine or in other publications published by The Time Inc. Magazine Company, its parent, subsidiaries or affiliates, provided that you shall be paid the then prevailing rates of the publication in which the Story is republished.

(Keller Dec. Ex. C7.) Plaintiff Whitford claims that he did not intend, by this language, to grant Time electronic rights in his article. (Pl.s' Mot. Summ. J. Ex. 14.)

### B. *The Technological Reproductions*

Beginning in the early 1980s, the defendant publishers entered into a series of agreements pursuant to which they sold the contents of their periodicals to the electronic defendants. NEXIS has carried the articles appearing in *Sports Illustrated* since 1982, *The New York Times* since 1983, and *Newsday* since 1988. (Keller Dec. Ex. B5 at ¶¶ 3, 4, 8.) UMI has distributed "The New York Times OnDisc" since 1992, and *The New York Times Magazine and Book Review* have been available on the image-based CD–

---

**2.** The New York Times has recently adopted a policy pursuant to which the paper accepts articles by freelance writers only on the express written condition that the author surrender all rights in his or her creation. (Pl.s' Mot. Summ. J. Ex. 43.)

ROM since 1990. (Keller Dec. Ex. B6 at ¶¶ 3, 8.)

### 1. NEXIS

The defendant publishers deliver or electronically transmit to NEXIS the full text of all of the articles appearing in each daily or weekly edition of their periodicals. The publishers provide NEXIS with a complete copy of computer text files which the publishers use during the process of producing the hard copy versions of their periodicals. Coded instructions as to page lay out added to these files permit typesetters working for the publishers to produce "mechanicals"—which resemble full pages as they will appear at publication—copies of which are transmitted to printing facilities for mass production. NEXIS does not use the electronic files to create "mechanicals" or to emulate the physical lay out of each periodical issue: such things as photographs, advertisements, and the column format of the newspapers are lost. NEXIS instead uses the electronic files to input the contents of each article on-line along with such information as the author's name, and the publication and page in which each article appeared. The articles appearing in *The New York Times* and *Newsday* are available within twenty-four hours after they first appear in print, and the articles from an issue of *Sports Illustrated* appear on-line within forty-five days of the initial hard copy publication.

Customers enter NEXIS by using a telecommunications package that enables them to access NEXIS' mainframe computers. Once on-line, customers enter "libraries" consisting of the articles from particular publications, or groups of publications. Customers can then conduct a "Boolean search" by inputting desired search terms and connectors from which the system generates a number of "hits." These "hits," the articles in the library corresponding to the selected search terms, can be reviewed either individually or within a citation list. A citation list identifies each article by the publication in which it appeared, by number of words, and by author. When a particular article is selected for full-text review, the entire content of the article appears on screen with a heading providing the same basic information reported within a citation list. Although articles are reviewed individually, it is possible for a user to input a search that will generate all of the articles—and only those articles—appearing in a particular periodical on a particular day.

### 2. The New York Times OnDisc

"The New York Times OnDisc," the text only CD–ROM product, is created from the same data furnished by The New York Times to NEXIS. Indeed, at the end of each month, pursuant to a three-way agreement among The New York Times, NEXIS and UMI, NEXIS provides UMI with magnetic tapes containing this information. UMI then transfers the content of these tapes to CD–ROM discs and codes the included articles to facilitate Boolean searching.

Not surprisingly, given that the two systems share data, the text-based CD–ROM operates much like NEXIS. Users enter search terms prompting the system to access all corresponding articles. These articles are displayed with headings indicating the author, and the date and page of *The New York Times* issue in which the articles appeared. As with NEXIS, an article selected for review appears alone; there are no photographs or captions or columns of text. Moreover, a search typically retrieves articles which were published on different dates, though it is possible to conduct a search that will retrieve all of the articles making up a single issue of *The New York Times.*

### 3. General Periodicals OnDisc

"General Periodicals OnDisc," an image-based CD–ROM product, does not carry full issues of *The New York Times,* but only the *Sunday Magazine* and *Book Review.* It includes numerous other periodicals, as well, although none of those involved in this litigation. The image-based system differs from the other technologies presently at issue in that it is created by digital scanning. Articles are not inputted into the system individually, but the entire *Sunday Magazine and Book Review* are photographed producing complete images of these periodicals. Articles appear precisely as they do in print,

complete with photographs, captions, and advertisements.

"General Periodicals OnDisc" does not employ Boolean searching. Image based discs are sold alongside text-based discs, which are searchable, and which provide abstracts of articles. By searching these abstracts, users can identify articles that are of interest to them. Users can then return to the image-based system in order to retrieve those articles. Drawing upon this interplay between discs, plaintiffs propose that the image-based CD–ROMs are better characterized as part-text/part-image based CD–ROMs.

### C. The Parties' Dispute

All of the parties recognize that the defendant publications constitute "collective works" under the terms of the Copyright Act of 1976. A collective work is one "in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. The rights which exist in such works are delineated in 17 U.S.C. § 201(c):

> Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

Plaintiffs maintain that the publisher defendants have exceeded their narrow "priv-

ileges" under this provision by selling plaintiffs' articles for reproduction by the electronic defendants. In particular, plaintiffs complain that the disputed technologies do not revise the publisher defendants' collective works, but instead exploit plaintiffs' individual articles.[3]

Defendants Time and Newsday argue that they are not limited to those privileges set out at the conclusion of Section 201(c), because plaintiffs have "expressly transferred" the electronic rights in their articles. Newsday relies upon the check legends authorizing the publisher to include plaintiffs' articles "in electronic library archives." Time relies upon the "right first to publish" secured in its written contract with plaintiff Whitford. Plaintiffs insist that neither of these provisions contemplate the sort of electronic reproductions presently at issue.

Even without an express transfer of rights, all of the defendants maintain that the practice of electronically reproducing plaintiffs' articles is authorized under Section 201(c) of the Copyright Act. Defendants argue that the disputed technologies merely generate "revisions of [the defendant publishers'] collective work[s]," and therefore do not usurp plaintiffs' rights in their individual articles. 17 U.S.C. § 201(c). Plaintiffs counter that Section 201(c) was not intended to permit electronic revisions of collective works, and that, in any event, the technologies presently at issue are incapable of creating such revisions.

### DISCUSSION

### I. INTRODUCTION

Summary judgment is required when "there is no genuine issue as to any material

---

3. Plaintiffs complain that the electronic reproductions of their articles, on NEXIS and on disc, directly infringe their copyrights. They seek to hold defendants contributorily liable only to the extent that defendants have cooperated with one another in creating these allegedly infringing works. Plaintiffs do not advance the distinct claim that defendants are contributorily liable for potential copyright infringement by users of the disputed electronic services. (12/10/96 Tr. at 34 ("This is not a case in which we have accused the defendants ... of manufacturing or distributing machines or equipment that can be used by third parties in an infringing way.").) To prevail with

such a claim, which would be governed by *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 442, 104 S.Ct. 774, 789, 78 L.Ed.2d 574 (1984), defendants would merely have to demonstrate that the disputed technologies can be put to "substantial noninfringing uses." *See generally* Ariel B. Taitz, *Removing Road Blocks Along The Information Superhighway: Facilitating The Dissemination of New Technology v. By Changing The Law Of Contributory Copyright Infringement,* 64 Geo. Wash. L.Rev. 133 (1995) (proposing "non-trivial infringing use doctrine" as alternative approach to claims of contributory infringement).

fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party has the initial burden of 'informing the district court of the basis for its motion' and identifying the matter 'it believes demonstrate[s] the absence of a genuine issue of material fact.'" *Leibovitz v. Paramount Pictures Corp.,* 948 F.Supp. 1214, 1217 (S.D.N.Y.1996) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Once the movant satisfies its initial burden, the non-moving party must identify "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In assessing the parties' competing claims, the Court must resolve any factual ambiguities in favor of the nonmovant. *See McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993). It is within this framework that the Court must finally determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

■ Where there are cross motions for summary judgment, as there are here, "the standard is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other.... Simply because the parties have cross-moved, and therefore have implicitly agreed that no material issues of fact exist, does not mean that the court must join in that agreement and grant judgment as a matter of law for one side or the other." *Aviall, Inc. v. Ryder System, Inc.,* 913 F.Supp. 826, 828 (S.D.N.Y.1996) (citing *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)), *aff'd,* 110 F.3d 892 (2d Cir.1997).

## II. THE ALLEGED TRANSFER OF RIGHTS PURSUANT TO CONTRACT

Two of the publisher defendants, Newsday and Time, claim that plaintiffs "expressly transferred" electronic rights in their articles, and that it is therefore unnecessary to determine whether the electronic data bases produce revisions of these defendants' collective works. The Court disagrees.

### A. *Newsday*

■ According to Section 204(a) of the 1976 Act, "[a] transfer of copyright ownership ... is not valid unless an instrument or conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). "[A] writing memorializing the assignment of copyright interests 'doesn't have to be the Magna Carta; a one-line pro forma statement will do.' However, the terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear." *Papa's–June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1158–59 (S.D.N.Y.1996) (citing *Effects Associates, Inc. v. Cohen,* 908 F.2d 555, 557 (9th Cir.1990)).

The only writing that Newsday points to in support of the transfer of electronic rights appears on the back of the checks it issued to plaintiffs in payment for their articles. In particular, the publisher relies upon the language providing that Newsday has the "right to include [plaintiffs' articles] in electronic library archives." By the time Newsday sent plaintiffs' articles to NEXIS, however, plaintiffs had not yet received or cashed these checks. Plaintiffs therefore contend that any transfer of rights that might have been effected by the check legends occurred too late to excuse defendants' alleged infringement. *See R & R Recreation Products, Inc. v. Joan Cook Inc.,* 1992 WL 88171, * 4 (S.D.N.Y. 1992) ("R & R's assignment of the cat and mouse copyright to DMV does not preclude suit by R & R for infringement occurring prior to the assignment.").

■ Newsday responds by arguing that a "note or memorandum" of transfer can serve to validate a prior oral agreement. *See Eden Toys, Inc. v. Florelee Undergarment Co. Inc.,* 697 F.2d 27, 36 (2d Cir.1982) ("the 'note or memorandum of the transfer' need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement."); *see also Imperial Residential Design Inc. v. Palms*

*Development Group, Inc.,* 70 F.3d 96, 99 (11th Cir.1995) ("a copyright owner's later execution of a writing which confirms an earlier oral agreement validates the transfer ab initio."). Newsday is correct as to the law, but finds no support in the facts.

Newsday concedes that there is no evidence of any prior agreements concerning electronic rights in plaintiffs' articles. (Def. Newsday's Res. Pl.s' Rule 3(g) stmt No. 25 ("DEFENDANTS' RESPONSE: Other than the check endorsement ... there is no evidence of any express agreement, written or oral, between any of the plaintiffs and Newsday with respect to the articles at issue.").) The most Newsday claims is that the check legends confirmed "its understanding" that there had been a transfer of electronic rights in plaintiffs' articles. (Defs' Memo. Supp. Mot. Summ. J. at 14 n. 2.) This is not enough: the record reveals no basis for concluding that Newsday's purported "understanding" was shared by plaintiffs, all of whom deny that they ever intended to authorize the use of their articles on-line. Thus, Newsday cannot now rely upon its check legends to give retroactive effect to supposed unspoken agreements concerning electronic rights in plaintiffs' articles.

The check legends themselves, moreover, are ambiguous and cannot be taken to reflect an express transfer of electronic rights in plaintiffs' articles. *See Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 564 (2d Cir.) (finding that check legend providing for the "assignment ... of all right, title, and interest" was ambiguous, and did not effectively transfer copyright in certain paintings), *cert. denied,* —— U.S. ——, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995); *see also Papa's–June,* 921 F.Supp. at 1159 ("neither the royalty checks nor the attached royalty statements mention a transfer of copyright ownership."); *Museum Boutique Intercontinental, Ltd. v. Picasso,* 880 F.Supp. 153, 162 n. 11 (S.D.N.Y. 1995) ("the checks submitted by MBI, which

do not contain any explanatory notations besides 'Picasso royalties,' are not convincing proof, to say the least, of the alleged oral agreement."). Plaintiffs argue persuasively that the most reasonable interpretation of "electronic library archives" does not encompass NEXIS. Plaintiffs provide affidavits from experts who opine that an archive and a commercial data base contain different types of material and serve different purposes. (Pl.s' Mot. Summ. J. Ex. 17.); *cf. American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 919, 921 (2d Cir.1995) (photocopying of articles from scientific journal was characterized as "archival" where copies were kept in researcher's files for later reference and were not used for any "direct or immediate commercial advantage"). Plaintiffs also note, and Newsday admits, that Newsday maintains its own "electronic library archives," a computerized in-house storage system that serves no commercial purpose. (Pl.s' Mot. Summ. J. Ex. 35 at 26.) It is at least plausible—and would have been reasonable for plaintiffs to conclude—that Newsday was simply referring to such "archives" in its check legends. In any event, there is no evidence that plaintiffs understood, or should have understood, that the check legends implicated rights extending as far as NEXIS.

In short, there is no basis for holding that the Newsday check legends effected an unambiguous and timely transfer of any significant electronic rights in plaintiffs' articles.

### B. *Sports Illustrated*

■ In support of its Motion for Summary Judgment, defendant Time invokes Section 10(a) of its contract with Whitford. Pursuant to this provision, Sports Illustrated acquired the right "first to publish" Whitford's article. Arguing that this language includes no "media-based limitation," Time contends that its "first publication" rights must be interpreted to extend to NEXIS.[4] *See Bartsch v. Metro–*

---

4. By focusing upon Section 10(a) of its contract with Whitford, Time conspicuously avoids directly relying upon Sections 10(b) and 10(c). (Def. s' Memo. Supp. Mot. Summ. J. at 38 ("It is undisputed that Sports Illustrated acquired the right 'first to publish' Whitford's article, and that the agreement nowhere expressly delineated or limit-

ed the media in which such publication would be permissible. The issue, then, is to determine how to interpret the contract's scope in light of its silence on the issue of format.").) Each of these other provisions broadly authorizes Time to republish Whitford's story provided that the publisher compensates Whitford for the republica-

Goldwyn–Mayer, Inc., 391 F.2d 150, 154–55 (2d Cir.) (holding that the right to "exhibit" motion picture included the right to exhibit movie on television), cert. denied, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); see also Bourne v. Walt Disney Co., 68 F.3d 621, 629 (2d Cir.1995) ("motion picture" rights did not "unambiguously exclude" videocassette rights), cert. denied, —— U.S. ——, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996); L.C. Page & Co. v. Fox Film Corp., 83 F.2d 196, 199 (2d Cir.1936) ("exclusive moving picture rights" included "talkies" as well as silent films); Rooney v. Columbia Pictures Indus., Inc., 538 F.Supp. 211 (S.D.N.Y.) (exhibit "by any present or future method or means" included videocassette rights), aff'd, 714 F.2d 117 (2d Cir.1982), cert. denied, 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983).

Time's reliance upon the Bartsch line of authority is misplaced. Bartsch and its progeny stand for the proposition that when contract terms are broad enough to cover a new a technological use, "the burden of framing and negotiating an exception should fall on the grantor." Bartsch, 391 F.2d at 155. None of these cases, however, involved a contract (like the one before the Court) that imposed specific temporal limitations such as "first publication rights." The right to publish an article "first" cannot reasonably be stretched into a right to be the first to publish an article in any and all mediums. Cf. Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 564, 105 S.Ct. 2218, 2232, 85 L.Ed.2d 588 (1985) ("The right of first publication encompasses not only the choice whether to publish at all, but also the choices of when, where, and in what form first to publish a work.") (emphasis added). Because Whitford's article was "first" published in print, the electronic republication of that article some 45 days later simply cannot have been "first."

## III. COLLECTIVE WORKS UNDER THE COPYRIGHT ACT OF 1976

Because the Court cannot find that any of the plaintiffs expressly transferred electronic

rights in their articles, the numerous arguments and voluminous record in this case devolve to whether the electronic defendants produced "revisions," authorized under Section 201(c) of the Copyright Act, of the publisher defendants' collective works. The issue is narrow, but its resolution is not simple: there is virtually no case law parsing the terms of Section 201(c), and certainly no precedent elucidating the relationship between that provision and modern electronic technologies. Further complicating matters, the Copyright Act of 1976 was crafted through a unique and lengthy process involving the input of numerous experts from assorted interest groups and industries. See Barbara Ringer, First Thoughts On The Copyright Act Of 1976, 22 N.Y.L. Sch. L.Rev. 477 (1977). As a result, the pertinent legislative history is notoriously impenetrable. See generally Jessica D. Litman, Copyright Compromise, and Legislative History, 72 Cornell L.Rev. 857 (1987).

Despite the numerous challenges, there are several considerations which allow a principled approach to analyzing Section 201(c). Most importantly, the provision cannot be understood in isolation, but must be considered alongside other sections of the Act.

### A. Collective Works And Derivative Works Under Section 103(b)

"Both collective works and derivative works are based upon preexisting works that are in themselves capable of copyright." 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 3.02, at 3–8 (1996 ed.). A derivative work "transforms" one or more such preexisting works into a new creation. See 17 U.S.C. § 101. A collective work, on the other hand, consists of numerous original contributions which are not altered, but which are assembled into an original collective whole. Id. In both instances, the copyright law accounts for the fact that the larger work— although it is entitled to copyright protection—consists of independent original contributions which are themselves protected.

tion. Whitford also does not rely upon these provisions, and does not advance any contract

claim against Time.

■ The 1976 Act addresses the competing copyright interests apparent in both derivative works and collective works in Section 103(b). Pursuant to this provision:

> The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.[5]

17 U.S.C. § 103(b). Section 103(b) does not represent an innovation under the 1976 Act, but is intended merely to clarify a point "commonly misunderstood" under Section 7 of the 1909 Act.[6] H.R. Report No. 94–1476, at 57 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5670. Specifically, "copyright in a 'new version' covers only the material added by the later author, and has no effect one way or the other on the copyright or public domain status of the preexisting material." *Id.*

The "misunderstanding" regarding copyright protection in "new versions" and in "preexisting materials" developed largely in connection with derivative works, and grew out of the "new property rights" approach espoused, most prominently, by Judge Friendly of the Second Circuit. *See Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484 (2d Cir.) (holding that film producer retained rights in underlying story despite fact that novelist, who authorized initial use of story, died before granting producer renewal rights), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). According to this view, "once a derivative work is created pursuant to a valid license to use the underlying material, a new property right springs into existence with respect to the entire derivative work, so that even if the license is thereafter terminated, the proprietor of the derivative work may nevertheless continue to use the material from the underlying work as contained in the derivative work." Nimmer, § 3.07[A][1], at 3–34.9. Numerous authorities on copyright law, including Professor Nimmer, assailed the reasoning in *Rohauer,* deriding the "new property rights" approach as "neither warranted by any express provision of the Copyright Act, nor by the rationale as to the scope of protection achieved in a derivative work." *Id.*

Prior to its holding in *Rohauer,* and contrary to the "new property rights" approach, the Second Circuit had upheld several claims of infringement based upon the unauthorized reuse—by the owner of a valid copyright in a derivative work—of the protected preexisting material. *See, e.g., Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir.1976); *G. Ricordi & Co. v. Paramount Pictures Inc.,* 189 F.2d 469 (2d Cir.) (prohibiting plaintiff, in declaratory judgment action, from making a motion picture version of an opera that had been created with the permission of the author of the underlying work), *cert. denied,* 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); *see also Russell v. Price,* 612 F.2d 1123, 1128 (9th Cir.1979) ("since exhibition of the film 'Pygmallion' necessarily involves exhibition of parts of Shaw's play, which is still copyrighted, plaintiffs here may prevent defendants from renting the film for exhibition without their authorization."), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980). In *Gilliam,* for instance, the Court granted an injunction in favor of plaintiffs, the members

---

**5.** Collective works are "compilations" which are composed of protected "preexisting material." *See* Section IIIB3, *infra.* Accordingly, Section 103(b) speaks directly to the copyright status of collective works. *See* Nimmer, § 3.07[A][1], at 3–34.9 n. 1.

**6.** Section 7 of the 1909 Act provided as follows:

Compilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright ... but the publication of any such new works shall not effect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

17 U.S.C. § 7 (1976 ed.) (repealed by Copyright Act of 1976).

of a British comedy troop, who claimed that the BBC infringed their copyright in certain scripts. Plaintiffs had authorized the BBC to broadcast television programs based upon these scripts, but took exception when the BBC subsequently sold the programs to the defendant, an American television network which edited the programs prior to airing them in the United States. In support of its decision to enjoin the defendant from airing those edited versions for a second time, the Second Circuit reasoned that, under Section 7 of the 1909 Act, "any ownership by BBC of the copyright in the recorded program would not affect the scope or ownership of the copyright in the underlying script." *Gilliam,* 538 F.2d at 20. The use of that script without plaintiffs' consent would therefore constitute infringement, "even with the permission of the proprietor of [a] derivative work [based upon that script]." *Id.*

Upholding a Ninth Circuit opinion which rejected *Rohauer* in favor of the Second Circuit's earlier approach in *Gilliam* the Supreme Court finally and firmly settled the "new property rights" controversy. *See Stewart v. Abend,* 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). In *Abend,* the author of a fictional story agreed to assign the rights in his renewal copyright term to the owner of a movie version of that story, but died before the commencement of the renewal period. Because the assignment never occurred, the Court held that defendant infringed the copyright of the successor owner of the story by continuing to distribute the film during the renewal term of the preexisting work.

▮ In reaching its result, the *Abend* Court rejected defendants' view, based on *Rohauer* that the "creation of the 'new,' *i.e.,* derivative, work extinguishes any right the owner of rights in the preexisting work might have had to sue for infringement . . ." *Id.* at 222, 110 S.Ct. at 1761. Citing Nimmer, the Court concluded that such an approach runs counter to the terms of both Section 7 of the 1909 Act and Section 103(b) of the 1976 Act, each of which advances the same fundamental formula:

> The aspects of a derivative work added by the derivative author are that author's

property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work. So long as the pre-existing work remains out of the public domain, its use is infringing if one who employs the work does not have a valid license or assignment for use of the preexisting work. It is irrelevant whether the preexisting work is inseparably intertwined with the derivative work.

*Abend,* 495 U.S. at 223, 110 S.Ct. at 1761 (citations omitted). Thus, Section 103(b) of the 1976 Act—like Section 7 of the 1909 Act before it—stands as a rejection of the new property rights theory. *Id.; see* also Nimmer, § 3.07, at 3–34.9 n. 3. (describing Section 103(b) as "hardly consistent with the new property right theory"). Under Section 103(b), any unauthorized use of preexisting protected material by the creator of a derivative or a collective work infringes the copyright existing in that preexisting material.

B. Defendants' "Privileges" Under Section 201(c)

The first sentence of Section 201(c)—providing that the "[c]opyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution"—essentially reiterates the substance of Section 103(b). If the provision ended with its first sentence, plaintiffs would prevail in this action. With no "new property right" in the articles making up their collective works, the publisher defendants would not be at liberty to reuse plaintiffs' individual contributions even in new versions of their own periodicals. *See Abend,* 495 U.S. 207, 110 S.Ct. 1750; *see also Gilliam,* 538 F.2d 14. In its second sentence, however, Section 201(c) expands upon the baseline established in Section 103(b) by extending to the creators of collective works "only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series." 17 U.S.C. § 201(c). The determinative issue here, then, is the precise scope of these "privileges."

### 1. Privileges As Transferrable Rights

■ Plaintiffs liken the "privileges" which Section 201(c) extends to "the owner of copyright in the collective work" to narrowly circumscribed nonexclusive licenses. Unlike assignments or exclusive licenses or most other conveyances under copyright law, such limited grants are not transferrable. *See* 17 U.S.C. § 101 (defining "transfer of copyright ownership"). Because the publisher defendants own the copyrights in their collective works, plaintiffs reason that the electronic defendants are guilty of infringement even in the event that they are creating revisions—authorized by the publisher defendants—of the disputed periodicals. (Pl.s' Memo. Supp. Mot. Summ. J. at 16, n. 15; Pl.s' Memo. Opp. Def.s' Cross–Mot. Summ. J. at 19–23.)

Plaintiffs arrive at their understanding of the term "privileges" by juxtaposing Section 201(c) with Section 201(d). The first clause of the latter section provides that "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law ...." 17 U.S.C. § 201(d)(1). According to Section 201(d)(2):

> Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

In plaintiffs' view, the fact that Section 201(d)(2) provides for the transfer of "rights" can only be taken to mean that the "privileges" identified in the preceding section of the Act are nontransferable. This approach distorts the relationship between Section 201(c) and Section 201(d).

Section 201(d)(2) does not speak only of "rights," but also of any "subdivision" of rights. The potential for such a subdivision of rights is created in the preceding section, 201(d)(1), which permits the transfer of copyright, "in whole or in part," either by conveyance or by "operation of law." This recognition of the potential for a partial transfer of copyright "by operation of law" follows from the fact that exactly such a transfer is effect-ed in the preceding Section of the Act, Section 201(c), which extends certain enumerated "privileges" to publishers. In other words, the three provisions operate in tandem: Section 201(c) transfers plaintiffs' copyrights, "in part," to defendants—a permissible exercise under Section 201(d)(1)—and therefore, under Section 201(d)(2), defendants are left with full authority over the "subdivision" of rights they acquire.

When Sections 201(c) and 201(d) are placed into historical context, the weakness in plaintiffs' position is all the more apparent. The 1976 Act, in significant part, amounts to a repudiation of the concept of copyright indivisibility, a principle pursuant to which the assorted rights comprising a copyright could not be assigned in parts, *i.e.* subdivided. *See* Nimmer, § 10.01[A], at 10–5. Under this former regime, individual authors were at risk of inadvertently surrendering all rights in a contribution to a collective work either to the publisher of that work, or to the public. *Id.* Under Sections 201(c) and (d) of the 1976 Act, that threat is gone. Authors are no longer at risk of losing all rights in their articles merely because they surrender a small "subdivision" of those rights—either by operation of Section 201(c) or by express transfer—to the publishers of collective works.

The aim of Section 201(c)—to avoid the "unfair[ness]" of indivisibility—would not be further served by equating "privileges" with nonexclusive licenses. H.R. Report No. 94–1476, at 122 (1976), U.S.Code Cong. & Admin.News 1976, p. 5738. As explained, Congress was not responding to any perceived problem associated with the ability of publishers to enlist the help of outside entities to produce versions of their collective works, but rather to the risk that publishers of collective works might usurp all rights in individual articles. It simply would not have advanced its goal for Congress to have constrained publishers in their efforts to generate and distribute their permitted revisions and reproductions. Such an approach would not prevent the exploitation of individual contributions, but would serve only to undermine the competing goal of ensuring that collective works be marketed and distributed

to the public. *See* H.R.Rep. No. 94–1476, at 122 (1976), U.S.Code Cong. & Admin.News 1976, p. 5738 (characterizing the Section 201(c) privileges extended to publishers an "essential counterpart" to the basic presumption favoring authors).

The term "privilege" is used in Section 201(c) to underscore that the creators of collective works have only limited rights in the individual contributions making up their collective works; the term does not indicate that the creators of collective works are limited in exercising those few rights, or "privileges," that they possess. Thus, to the extent that the electronic reproductions qualify as revisions under Section 201(c), the defendant publishers were entitled to authorize the electronic defendants to create those revisions.

### 2. Reproductions, Revisions, and Computer Technology

Plaintiffs advance several arguments in support of their view that the framers of Section 201(c) intended to limit the creators of collective works to revising and reproducing their works in the same medium in which those collective works initially appeared. For the reasons discussed, however, the Court finds nothing in the terminology of Section 201(c), the relevant legislative history, or the nature of revisions generally which supports such an approach.[7]

#### a. Display Rights

Plaintiffs contend that the right to reproduce articles as part of a collective work, because it is unaccompanied by other key rights, necessarily precludes the use of computer technologies. Plaintiffs refer to Section 106 of the 1976 Act, which lists the five exclusive rights, *i.e.*, the "bundle" of rights, constituting a copyright. The "reproduction" privilege identified under Section 201(c), as plaintiffs note, invokes the first of these rights—the right "to reproduce the copyrighted work in copies or phonorecords." *See* 17 U.S.C. § 106(1). Section 201(c) does not, however, implicate the distinct right, under Section 106, to "display the copyrighted work publicly." *Id.* at § 106(5). In plaintiffs' view, this absence of any express grant of "display" rights is fatal to defendants' position because a work cannot be reproduced electronically unless it is "displayed" on a computer screen.

By focusing upon the "display" rights that are not granted under Section 201(c), plaintiffs fail to account fully for the "reproduction" rights that are extended to the owners of copyright in collective works. Although "reproduction" is not defined separately under the Act, Section 106 reveals—predictably enough—that reproductions result in "copies." As defendants emphasize, this is a term with a broad and forward looking definition:

'Copies' are material objects, other than phonorecords, in which a work is fixed by *any method now known or later developed,* and from which the work can be *perceived,* reproduced, or otherwise communicated, either directly or *with the aid of a machine or device* ...

17 U.S.C. § 101 (emphasis added). Thus, the right to reproduce a work, which necessarily encompasses the right to create copies of that work, presupposes that such copies might be "perceived" from a computer terminal.[8]

---

**7.** Plaintiffs undermine their arguments by struggling with the copyright implications of microfilm, a high resolution film which permits users to scroll through entire issues of periodicals. (*Compare* 10/17/96 Tr. at 41 ("I believe that I have conceded this to opposing counsel previously, that I think its possible that the right to make microfilm editions of a publication or a periodical is encompassed by the 201(c) privilege"), *with* 12/10/96 Tr. at 50 (deeming it "probably the correct interpretation of 201(c)" that "even an electronic equivalent of microfilm would be a violation").) Of course, if it is "possible" that Section 201(c) permits microfilm reproductions

of collective works, it is impossible that Section 201(c) prohibits reproductions in a new medium.

**8.** In searching for a reason that microfilm reproductions of collective works might be permissible under Section 201(c), plaintiffs themselves suggest another approach to rejecting their display rights argument. (10/17/96 Tr. at 52 "I would agree with your Honor that they have the right under 201(c) and 109(c) to take plaintiffs' work without their permission and put it in a microfilm.") Section 109(c) permits a person lawfully in possession of a copy of a protected work "to display that copy publicly." 17 U.S.C. § 109(c). Thus, if defendants have reproduced plaintiffs'

Plaintiffs argue that the legislative history precludes the Court from reading "display" rights into Section 201(c). As plaintiffs point out, early draft versions of Section 201(c) extended the "privilege to publish"—instead of the privilege to "reproduce" and "distribute"—individual contributions in subsequent versions of a collective work. (Pl.s' Memo. Opp. Def. s' Mot. Summ. J. at 22, n. 37.) " 'Publication' is the distribution of copies ... of a work to the public." 17 U.S.C. § 101. More importantly, for plaintiffs' purposes, "publication" contemplates the public distribution of a work "for purposes of further distribution, public performance, or public *display* ...." *Id.* (emphasis added). The absence of the term "publish" from the final version of Section 201(c), according to plaintiffs, must therefore be taken to indicate the absence of any such display rights.

The problem with plaintiffs' argument is that it rests on the unfounded assumption that the replacement of the term "publish" in Section 201(c) necessarily amounted to a rejection not only of that term, but also of the rights it connotes. There is no hint in the pertinent legislative history, however, that Congress settled upon its "reproducing and distributing" language for purpose of diminishing the publication rights initially envisioned for the creators of collective works. To the contrary, it appears that the "reproducing and distributing" language—a seeming paraphrase of the "distribution of copies" language the Act uses to define "publication"—was meant to secure precisely those rights. Indeed, the House Report explicitly equates the privilege of "reproducing and distributing" a contribution as part of a "particular collective work" with the "privilege of *republishing* the contribution under certain limited circumstances." H.R. Report No. 94-1476, at 122 (1976), U.S.Code Cong. & Admin.News 1976, p. 5738 (emphasis added).

■ In sum, both the terms of the 1976 Act, and the pertinent legislative history, reveal a design to extend display rights, in "certain limited circumstances," to the creators of collective works. Thus, so long as

articles in accord with the conditions set under Section 201(c), they would be entitled to display

defendants are operating within the scope of their privilege to "reproduce" and "distribute" plaintiffs' articles in "revised" versions of defendants' collective works, any incidental display of those individual contributions is permissible.

### b. The Updated Encyclopedia

Plaintiffs' narrow reading of defendants' reproduction and revision rights is informed not only by the absence of any "display" rights under Section 201(c), but also by the examples of revisions included in the pertinent legislative history. In particular, plaintiffs rely upon the following passage of the House Report accompanying Section 201(c):

> Under the language of this clause a publishing company could reprint a contribution from one issue in a later issue of its magazine, and could reprint an article from a 1980 edition of·an encyclopedia in a 1990 revision of it; the publisher could not revise the contribution itself or include it in a new anthology or an entirely different magazine or other collective work.

H.R. Report No. 94-1476, at 122-23 (1976), U.S.Code Cong. & Admin.News 1976, p. 5738. To plaintiffs, the modest reach of the encyclopedia example suggests a narrow scope to the term revision, one not contemplating new technologies or significant alterations of format and organization.

For several reasons, plaintiffs are mistaken to approach the encyclopedia example as the outer boundary of permissible revision. Foremost, the language of Section 201(c) does not support the sort of media restriction that plaintiffs infer from the legislative history. *Cf. Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991) ("When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances."). Indeed, Section 201(c) contains no express limitation upon the medium in which a revision can be created. To the contrary, "any revision" of a collective work is permissible,

those copies pursuant to Section 109(c).

provided it is a revision of "that collective work."[9]

Plaintiffs attribute the absence of any express prohibition on electronic revisions to the fact that electronic data bases were not a part of the "Congressional consciousness" at the time that Section 201(c) was drafted. (Pl.s' Memo. Supp. Summ. J. at 41.) It is more accurate to say that Congress was aware of such technologies, but did not fully understand their implications. *See* Arthur R. Miller, *Copyright Protection For Computer Programs, Databases, And Computer Generated Works: Is Anything New Since CONTU?*, 106 Harv. L.Rev. 977, 979 (1993). Recognizing its ignorance in such matters, Congress expressly declined—as of the time it passed the 1976 Act—to settle the copyright implications of "automatic systems capable of storing, processing, retrieving, or transferring information ..." 17 U.S.C. § 117 (repealed by Computer Software Protection Act, Pub.L. No. 96–517, § 117, 94 Stat. 3015, 3028 (1980)). Congress determined that such developing computer technologies required continued investigation, and organized a study of the matter by the National Commission on New Technological Uses of Copyrighted Works (CONTU). H.R.Rep. No. 1476, 94th Cong., 2d Sess. 116 (1976). In 1980, after CONTU determined that the 1976 legislation would afford "the desired substantive legal protection for copyrighted works which exist in machine readable form," Congress repealed the original Section 117. *Id.* at 40. Plaintiffs invoke this history, particularly the initial reluctance of Congress to delve into the realm of computer technologies, as evidence that Section 201(c) was not intended to vest defendants with electronic rights in their collective works.

The legislative history that plaintiffs describe undercuts their argument more than it advances it. The fact that Congress initially saw the need to pass Section 117 is strong indication that, in the absence of such an explicit limitation, it is to be presumed that the terms of the 1976 Act encompass all variety of developing technologies. With the repeal of Section 117, this presumption is restored with respect to computers. Thus, there is no remaining reason to foreclose the possibility of an electronic "revision" of a collective work.

As defendants emphasize, the 1976 Act was plainly crafted with the goal of media neutrality in mind. *See* Register's Report on the General Revision of the U.S. Copyright Law, included in Nimmer at Volume 5, Appendix 14 at 14–8 ("technical advances have brought in new industries and new methods for the reproduction and dissemination of the ... works that comprise the subject matter of copyright.... In many respects, the [1909 Act] is uncertain, inconsistent, or inadequate in its application to present-day conditions."); *see also* Copyright Law Revision: Hearing on H.R. 4347, 5680, 6831, 6835 Before Subcommittee No. 3 of the House Committee on the Judiciary, 89th Cong., 1st Sess. 57 (1965) (testimony of George D. Cary, Deputy Register of Copyrights: "We have tried to phrase the broad rights granted in such a way that they can be adapted as time goes on to each of new advancing media."). Key terms of the Act are defined to accommodate developing technologies. *See, e.g.,* 17 U.S.C. § 101 (defining "copies" in terms of "any method now known or later developed"; defining "literary works" as works "expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied."). Equally telling, none of the provisions of the Act limit copyright protection to existing technologies. The unusual exception of the original Section 117 only demonstrates that Congress took steps to ensure that its media neutral approach could effectively accommodate developing technologies before ultimately determining that the terms of the 1976 Act were fully equipped for the task.

In sum, it is unwarranted simply to assume—on the basis of one example provided

---

**9.** As explained in Section III.B.3., *infra,* a collective work is defined not by the medium in which it appears, but by its original selection and organization of articles and other materials. *See* *Feist Publications, Inc. v. Rural Telephone Service Company, Inc.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

in the legislative history of Section 201(c)— that Congress intended for the terms "reproduction" and "revision" to announce a radical departure from the media neutrality otherwise characterizing the Copyright Act of 1976.

#### c. A "Plain Reading" of the Term Revision

Throughout their pleadings, plaintiffs seemingly presume that a "revision," by its plain meaning, must be nearly identical to an original. Particularly in the context of the Copyright Act of 1976, this is not so obvious. Conceived as a "revision" of the 1909 Act, the 1976 Act thoroughly changed the face of copyright law in the United States. *See* Barbara Ringer, *First Thoughts On The Copyright Act Of 1976*, 22 N.Y.L. Sch. L.Rev. 477, 479 (1977).

At a bare minimum, the Copyright Act contemplates that a "revision" can alter a preexisting work by a sufficient degree to give rise to a new original creation. *See* 17 U.S.C. § 101. Indeed, a "derivative work," which is itself an "original work of authorship," can be created by means of "editorial revisions" to a preexisting work. *Id.* Thus, even the revised encyclopedia might differ from its predecessor edition by a "substantial, and not merely trivial" degree. *See Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 34 (2d Cir.1982). If "editorial revisions" can transform a work to this extent, the broader "any revisions" language of Section 201(c) suggests the promise of even greater change.[10]

■ The structure and language of Section 201(c) confirm that the parameters of a permissible revision are broader than plaintiffs suppose. Section 201(c) authorizes publishers to "reproduce" an individual contribution "as part of ... any revision" of the collective work in which it initially appeared.

By allowing only "reproductions" of individual contributions, and not revisions of those contributions, Congress plainly intended to prevent publishers from reshaping or altering the content of individual articles. With this limitation in place, Congress apparently was willing to permit publishers significant leeway, *i.e.*, the leeway to create "any revision" of their collective works.

The legislative history is consistent with this construction of Section 201(c). An early draft version of the provision permitted publishers to reproduce an individual contribution to a collective work "as part of that particular collective work and any revisions of it." Harriet Pilpel, a prominent author representative, expressed the following concern related to this language:

> I have but one question with reference to the wording, and that is with respect to the wording at the end of subsection (c): "... and any revisions of it." If that means 'any revision of the collective work' in terms of changing the contributions, or their order, or including different contributions, obviously the magazine writers and photographers would not object. But there is an implication, or at least an ambiguity, that somehow the owner of the collective work has a right to make revisions in the contributions to the collective work. This is not and should not be the law, and consequently I suggest that the wording at the end of subsection (c) be changed to make that absolutely clear.

1964 Revision Bill with Discussions and Comments, 89th Cong., 1st Sess., Copyright Law Revision, Part 5, at 9 (H. Comm. Print 1965). In other words, authors were comfortable permitting publishers broad discretion in revising their collective works, provided that individual articles would remain intact. Section 201(c) was modified to accommodate

---

**10.** The Author's Guild of America, as amicus on plaintiffs' behalf, argues that plaintiffs' narrow reading of the term "revision" follows from the dictionary definition of that term: a definition which encompasses "new" and "up-to-date" versions of a prior work. (Memo. Author's Guild at 7 citing Webster's Ninth New Collegiate Dictionary 1010 (1983).) This hardly advances plaintiffs' position. As explained, a derivative work is a "new" version of a preexisting work; although such a work "borrows substantially" from the work that preceded it, a derivative work is characterized by the fact that it is sufficiently unlike that preexisting work to be termed an original creation. *See Eden Toys*, 697 F.2d at 34. Moreover, derivative works are routinely created within a different medium than the works upon which they are based. *See e.g., Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1373 (2d Cir.1993) (classifying a book as a derivative version of the television program upon which it was based).

these narrow concerns, and it now clarifies that a publisher is not permitted to revise an original contribution to a collective work, but is permitted to reproduce that contribution "as part of ... any revision" of "that collective work" in which it initially appeared.

In sum, Section 201(c) does not impose any significant limitations upon publishers through the use of such terms as "privilege," "reproducing," or "any revision." A privilege is transferrable; a reproduction can occur in any medium; and "any revision" might include a major revision. The key limitation imposed upon publishers under Section 201(c) rests in the fact that publishers are permitted only to reproduce a particular plaintiff's article "as part of" a revised version of "that collective work" in which the article originally appeared.

### 3. Revising "That Collective Work"

Although the "any revision" language of Section 201(c) is broad, a new work must be recognizable as a version of a preexisting collective work if it is to be fairly characterized a revision of "that collective work." 17 U.S.C. § 201(c). Considering that defendants are prohibited from changing the content of plaintiffs' individual articles, this gives rise to something which, at first blush, might seem puzzling: how can a particular collective work, one made up entirely of separate contributions, be revised without making changes to those contributions? The resolution of this question rests in the fact that collective works, even to the extent that they consist entirely of individual original contributions, possess distinguishing original characteristics of their own—i.e., they are greater than the sum of their parts. It is therefore possible to revise a collective work by changing the original whole of that work without altering the content of the individual contributions to that work.[11]

In order to identify the original characteristics of a collective work, it is useful to recognize that collective works are a form of compilation. "A compilation is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. "Many compilations consist of nothing but raw data—i.e., wholly factual information not accompanied by any original written expression." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991). Collective works are a unique form of compilation only because they are not made up of facts, but of "separate and independent works" protected as the original contributions of individual authors. 17 U.S.C. § 101.

Because it is a "bedrock principle of copyright" that no author may possess a copyright in facts, the Supreme Court has struggled to identify those aspects of factual compilations that might reflect the original contribution of the copyright holders in such works. *See Feist*, 499 U.S. 340, 111 S.Ct. 1282. Ultimately, the *Feist* Court determined that "[t]he only conceivable expression is the manner in which the compiler has selected and arranged the facts." *Id.* at 349, 111 S.Ct. at 1289. Because the creator of a collective work, like the creator of any compilation, has no rights in the component parts of his or her work, this same formulation applies. In other words, the creators of collective works are entitled to rights in those works only to the extent that they have demonstrated creativity in selecting and arranging preexisting materials into an original collective whole. *See* H.R. Report No. 94–1476, at 122, U.S.Code Cong. & Admin.News 1976, p. 5738 (explaining that publishers' "exclusive rights" extent "to the elements of compilation and editing that went into the collective work as a whole ...". It is this original contribution which gives a collective

---

11. Many of the original contributions included in the defendant publishers' periodicals qualify as "works made for hire." 17 U.S.C. § 201(b). These pieces are written by employees of the defendant publishers, and the publishers therefore obtain full rights in those articles, including the right to alter those articles. *Id.* Because defendants do not argue that any of plaintiffs' articles qualify as works made for hire, the analysis here focuses only on those rights that the publisher defendants acquire over the articles appearing in their publications simply on the basis of the distinct copyright protection they hold in their collective works.

work its unique character, *i.e.*, which makes it identifiable as "that collective work."

Because compilations, and collective works, are characterized by the fact that they possess relatively little originality, defendants must walk a fine line in their efforts to revise their collective works. Defendants are not permitted to place plaintiffs' articles into "new anthologies" or "entirely different magazine[s] or other collective work[s]," but only into revisions of those collective works in which plaintiffs' articles first appeared. *See* H.R. Report No. 94–1476, at 122–23 (1976), U.S.Code Cong. & Admin.News 1976, p. 5738; *see also Quinto v. Legal Times of Washington, Inc.*, 506 F.Supp. 554 (D.D.C. 1981) (holding that law school newspaper could not authorize a separate District of Columbia newspaper to reprint an article originally published by the law school). If defendants change the original selection and arrangement of their newspapers or magazines, however, they are at risk of creating new works, works no longer recognizable as versions of the periodicals that are the source of their rights. Thus, in whatever ways they change their collective works, defendants must preserve some significant original aspect of those works—whether an original selection or an original arrangement—if they expect to satisfy the requirements of Section 201(c). Indeed, it is only if such a distinguishing original characteristic remains that the resulting creation can fairly be termed a revision of "that collective work" which preceded it.

## C. Applying Section 201(c)

Even to the extent that they accept that an electronic revision of a collective work is a theoretical possibility, plaintiffs insist that the technologies presently at issue "deal in individual articles and not in collective works." (Pl.s' Mem. Supp. Mot. Summ. J. at 37.) For instance, searches retrieve the fill content of individual articles, and not of entire issues. The electronic defendants add coding to individual articles in order to facilitate Boolean searching. Individual articles are stored as separate "files" within the system, where they exist alongside almost countless articles from numerous other publications. Moreover, for the convenience of users, articles are supplemented to make them useful on a stand alone basis; headers appear with each article identifying the author, and the publication and page in which the article appeared. In short, plaintiffs complain that defendants not only fail to preserve their collective works, they actively dismantle those works for purposes of electronically exploiting plaintiffs' individual contributions.[12]

### 1. Aspects Of Defendants' Periodicals Preserved Electronically

In order to evaluate plaintiffs' contention that NEXIS and the disputed CD–ROMs "remove everything that constitutes the originality" of the publisher defendants' collective works, it is necessary first to identify the distinguishing original characteristics of those works. (10/17/96 Tr. at 38.) To the extent that defendants' publications reveal an original selection or arrangement of materials, the Court must then determine whether these characteristics are preserved electronically. This two step approach is closely analogous—virtually identical—to the analysis undertaken by those courts confronted with claims of copyright infringement brought by the creators of factual compilations. *See,*

---

**12.** Within this framework, plaintiffs struggle to explain their objections to "General Periodicals OnDisc," which carries photographic images of *The New York Times Sunday Magazine and Book Review.* Plaintiffs initially argued that these CD–ROMs do not carry full issues of *The New York Times,* but only discreet sections. The *Sunday Magazine and Book Review,* however, are self contained periodicals, *i.e.,* collective works, and defendants are therefore entitled to reproduce them.

At a December 10, 1996 hearing, plaintiffs turned their attention to the abstracts accompanying the image based discs, arguing that these paragraph length synopses constitute unauthorized derivative versions of plaintiffs' articles. Defendants responded that plaintiffs had not raised this issue in any of their earlier submissions to the Court, and that defendants therefore had not had an opportunity to address the issue in discovery or in argument. The Court has since verified that defendants were correct, and therefore—as indicated during the December hearing—the Court will not consider whether the abstracts infringe plaintiffs' copyrights in their individual articles. (12/10/96 Tr. at 53.)

*e.g., Feist,* 499 U.S. 340, 111 S.Ct. 1282; *Lipton v. Nature Co.,* 71 F.3d 464 (2d Cir. 1995); *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61 (2d Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 72, 133 L.Ed.2d 32 (1995); *Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.,* 945 F.2d 509 (2d Cir.1991); *Nester's Map & Guide, Corp. v. Hagstrom Map Co.,* 796 F.Supp. 729 (E.D.N.Y.1992).

In the compilation infringement context, courts begin by determining whether the plaintiff's compilation exhibits sufficient originality to merit protection; if there is sufficient originality in either selection or arrangement, it is necessary to determine whether these original elements have been copied into the allegedly infringing work. *Id.; see also Skinder–Strauss Associates v. Massachusetts Continuing Legal Education, Inc.,* 914 F.Supp. 665, 672 (D.Mass.1995) ("If a party demonstrates that its compilation is sufficiently original to be copyrightable, he must further show copyright infringement ... 'The plaintiff must ... prove that the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar' as a matter of law.") (quoting *Lotus Development Corp. v. Borland Intern., Inc.,* 49 F.3d 807, 813 (1st Cir.1995)). A finding that an allegedly infringing work copies original aspects of a protected compilation supports a finding of infringement. There is no infringement where a defendant copies only the component parts of a protected compilation.

In the circumstances of this case, the same analysis leads to opposite results. If the disputed periodicals manifest an original selection or arrangement of materials, and if that originality is preserved electronically, then the electronic reproductions can be deemed permissible revisions of the publisher defendants' collective works. If, on the other hand, the electronic defendants do not preserve the originality of the disputed publications, but merely exploit the component parts of those works, then plaintiffs' rights in those component parts have been infringed. That this Court's revision analysis mirrors the Supreme Court's compilation infringement analysis reflects a common concern permeating both areas. Courts must ensure that the creators of factual compilations and collective works derive their rights solely from their original contributions, and that they not be permitted to usurp complete control over the component parts of their creations. *See* 17 U.S.C. § 103(b); *see also* Nimmer, 3.04[A], at 3–20–21 ("only that which is original with the copyright proprietor or his assignor may be protected by his copyright.").

In *Feist,* a telephone utility company claimed that the defendant publishers infringed its copyright in a local "white pages" by incorporating the phone numbers and addresses listed in that directory into a larger phone book covering a broader geographic region. Recognizing that the creator of a phone book cannot have any exclusive rights in the facts set forth in such a volume, the Court considered whether plaintiff had made any significant original contribution in creating its white pages. Though venturing that "the vast majority of compilations" would reflect sufficient originality in selection and in arrangement to merit protection, the Court concluded that "not every selection, coordination, or arrangement will pass muster." *Feist,* 499 U.S. at 358–59, 111 S.Ct. at 1294–95. Indeed, the plaintiffs' white pages were "entirely typical," merely providing an alphabetical listing of all of the phone numbers in a particular region. *Id.* at 362, 111 S.Ct. at 1296. Therefore, the Court held that defendant did not commit copyright infringement by copying the factual information set forth in plaintiffs directory.

In other instances, as envisioned by the Court in *Feist,* the selection and arrangement of matter in assorted compilations has been sufficiently original to warrant copyright protection. *See, e.g., Lipton,* 71 F.3d 464; *Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir.1984); *Key,* 945 F.2d 509; *CCC,* 44 F.3d 61 (holding that computer data base provider infringed plaintiff's copyright in book of used car valuations by including same selection of vehicles and same price estimates in online system); *Nester's Map & Guide Corp.,* 796 F.Supp. 729 (holding that publisher infringed plaintiff's copyright in a

taxi driver's guide of New York City by producing competing guide copying plaintiffs selection and arrangement of street listings). In *Lipton*, for instance, the Second Circuit held that defendant infringed plaintiff's copyright in a book of venery—a guide of "collective terms for identifying certain animal groups"—by releasing a compilation consisting of those very terms that plaintiff had selected for inclusion in his book. 71 F.3d at 467. In *Eckes*, the Court held that defendants infringed plaintiffs' copyright in a baseball card price guide by publishing a competing price "update" which listed essentially the same 5,000 cards that plaintiffs guide designated as "premium." 736 F.2d at 861. These and other decisions highlight that "[t]he amount of creativity, required for copyright protection of a compilation is decidedly small," and that the mere selection of information for publication can often times reflect sufficient originality to warrant copyright protection. *Lipton*, 71 F.3d at 470.

Although relatively little creativity is required to give rise to an original selection or arrangement of materials within a compilation or collective work, great care is required to preserve that original selection or arrangement in a subsequent work. In order to preserve an original selection of materials, for instance, a subsequent work must copy more than a "certain percentage" of those materials. *See Worth v. Selchow & Righter Company*, 827 F.2d 569, 573 (9th Cir.1987) (holding that defendants' trivia game did not copy original selection of facts included in plaintiffs trivia encyclopedia where defendant copied only a fraction of those facts), *cert. denied*, 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988). As the Second Circuit has put it, the subsequent work cannot differ in selection by "more than a trivial degree" from the work that preceded it. *See Kregos v. Associated Press*, 937 F.2d 700, 710 (2d Cir.1991) (holding that defendant did not infringe plaintiffs form of baseball pitching statistics by devising a competing form in-

cluding 6 of the 9 categories of statistics identified by plaintiff); *see also Lipton*, 71 F.3d at 471 (finding that defendant's allegedly infringing work contained "essentially the same selection" as plaintiffs).

■ One of the defining original aspects of the publisher defendants' periodicals is the selection of articles included in those works. Indeed, newspapers and magazines are quite unlike phone books. Far more so even than books of terminology or baseball card guides, selecting materials to be included in a newspaper or magazine is a highly creative endeavor. *The New York Times* perhaps even represents the paradigm, the epitome of a publication in which selection alone reflects sufficient originality to merit copyright protection. Identifying "all the news that's fit to print" is not nearly as mechanical (or noncontroversial) a task as gathering all of the phone numbers from a particular region. Indeed, recognizing matters of interest to readers is a highly subjective undertaking, one that different editors and different periodicals undoubtedly perform with varying degrees of success.

The defendant publishers' protected original selection of articles, a defining element of their periodicals, is preserved electronically. Articles appear in the disputed data bases solely because the defendant publishers earlier made the editorial determination that those articles would appeal to readers.[13] As a result, the disputed technologies copy far more than a "certain percentage" of the articles selected by the publisher defendants. *See Worth*, 827 F.2d at 573; *see also Kregos*, 937 F.2d at 710. Those technologies copy all of the articles which are selected to appear in each daily or weekly issue of *The New York Times* or *Newsday or Sports Illustrated*.

Although they recognize that the complete content of all of the articles from each disputed periodical are available electronically, plaintiffs point out that those articles are stored alongside almost countless other arti-

---

**13.** In this regard, there is no intervening original selection of articles that might render NEXIS or UMI's CD–ROMs separate collective works. *See* H.R. Report No. 94–1476, at 122–23 (1976), U.S.Code Cong. & Admin.News 1976, p. 5738 ("the publisher could not revise the contribution itself or include it in a new anthology or an entirely different. magazine or other collective work"). Plaintiffs have not, in any event, contended that NEXIS and the disputed CD–ROMs would qualify as such. (10/17/96 Tr. at 32.)

cles that appeared in other issues of other periodicals. This immersion into a larger data base does not automatically mean, however, that the defendant publishers' protected original selection is lost. *See CCC,* 44 F.3d at 68 n. 8 ("The district court also believed that CCC did not infringe Red Book's original protected elements because CCC included Red Book's selection in a more extensive data base. We disagree."). Indeed, the electronic defendants avoid this risk by taking numerous steps to highlight the connection between plaintiffs' articles and the hard copy periodicals in which they first appeared. For instance, users access plaintiffs' articles through data bases consisting only of those articles printed in a particular identified periodical, or particular periodicals. More importantly, once an article is selected for review, that article is identified not only by author, but by the publication, issue, and page number in which it appeared. Thus, the electronic technologies not only copy the publisher defendants' complete original "selection" of articles, they tag those articles in such a way that the publisher defendants' original selection remains evident online.[14]

### 2. Aspects Of Defendants' Periodicals Not Preserved Electronically

According to plaintiffs, the electronic reproductions cannot reasonably be considered revisions of the publisher defendants' periodicals because significant elements of each disputed periodical are not preserved electronically. Put differently, plaintiffs object to the Court's approach because it focuses upon that which is retained electronically, as opposed to that which is lost. Most notably, aside from the image-based CD–ROM, the disputed technologies do not reproduce the photographs, captions, and page lay-out of the defendant publications. With these significant differences between the technological reproductions and the defendant publications, plaintiffs' position has a certain appeal. There is no avoiding that much of what is original about the disputed publications is not evident online or on disc. Ultimately, however, these changes to the defendant publishers' hard copy periodicals are of only peripheral concern to the "revision" analysis.

By its very nature, a "revision" is necessarily a changed version of the work that preceded it. As already explained, (Section III.B.2.c., *supra* ), Section 201(c) permits even major changes to collective works. The framers of that provision sought to avoid the exploitation of individual articles, and did not intend to prevent publishers from reworking their collective works in significant ways. In order to permit such reworking, while at the same time preventing changes to the substance of individual articles, Congress determined that publishers would have the leeway to preserve certain original aspects of their creations while discarding others. In the words of Section 201(c), Congress determined that publishers would be permitted to create "any revision" of their collective works. The critical question for the Court, then, is not whether the electronic reproductions are different from the publisher defendants' collective works; it is inevitable that a revision will be different from the work upon which it is based. The question for the Court is whether the electronic reproductions retain enough of defendants' periodicals to be recognizable as versions of those periodicals.

Because a collective work typically possesses originality only in its selection and arrangement of materials, it is to be expected that, in a revised version of such a work,

14. The fact that the electronic services repeatedly identify the publication from which each article was obtained undermines the persuasive force of an analogy plaintiffs call upon throughout their briefs. Plaintiffs compare the articles appearing in the data bases with car parts; just as a wrecked vehicle is dissembled to create value in its individual parts, plaintiffs contend that each of the defendant publications quickly lose their value as collective works and are therefore electronically dissembled to create value in the individual articles. Once in a data base, however, an article's association with a particular periodical plainly enhances the value of that article. Indeed, an article appearing in *Newsday or The New York Times* is instantly imbued with a certain degree of credibility that might not exist in the case of an article never published, or an article published in other periodicals. To the extent that the articles appearing in electronic form can be likened to car parts, then, it is not those parts that can be fitted into most makes and models, but those that are available only at a premium because they meet the design specifications for a particular model produced by a particular automobile manufacturer.

either the selection or arrangement will be changed or perhaps even lost. This is precisely what has happened here. Lacking the photographs and page lay out of the disputed periodicals, NEXIS and "The New York Times OnDisc" plainly fail to reproduce the original arrangement of materials included in the publisher defendants' periodicals. By retaining the publisher defendants' original selection of articles, however, the electronic defendants have managed to retain one of the few defining original elements of the publishers' collective works. In other words, NEXIS and UMI's CD–ROMs carry recognizable versions of the publisher defendants' newspapers and magazines. For the purposes of Section 201(c), then, defendants have succeeded at creating "any revision[s]" of those collective works.

▮ The Court finds further support for its holding in the language of those compilation infringement cases that have already informed so much of the analysis in this decision. In particular, a work that copies *either* the original selection or the original arrangement of a protected compilation is "substantially similar" to that compilation for copyright purposes. *See Key*, 945 F.2d at 514 ("If the Galore Directory is substantially similar to the 1989–90 Key directory with regard to that arrangement of categories or that selection of businesses, then a finding of infringement can be supported.") (emphasis added). In other words, where a compilation possesses both an original arrangement and an original selection, a substantial similarity persists even where the original arrangement is sacrificed. *Id.* Thus, because the electronic data bases preserve defendants' original selection of articles, those data bases are "substantially similar," as a matter of law, to defendants' periodicals.[15]

By invoking the "substantial similarity" test of the compilation infringement cases, the Court does not mean to declare a fixed rule by which a revision of a particular collective work is created any time an original selection or arrangement is preserved in a subsequent creation. In certain circumstances, it is possible that the resulting work might be so different in character from "that collective work" which preceded it that it cannot fairly be deemed a revision. The Court need not speculate or hypothesize as to this possibility, however, because the electronic reproductions do more than merely preserve a defining element of the publishers' collective works. Those technologies preserve that element within electronic systems which permit users to consult defendants' periodicals in new ways and with new efficiency, but for the same purposes that they might otherwise review the hard copy versions of those periodicals. Indeed, in the broadest sense, NEXIS and CD–ROMs serve the same basic function as newspapers and magazines; they are all sources of information on the assorted topics selected by those editors working for the publisher defendants.[16]

15. "Substantial similarity," as a term or art, perhaps often times overstates the actual resemblance between two works. In particular, relatively little copying is required to render an allegedly infringing work "substantially similar" to a wholly original creation. *See, e.g., Twin Peaks*, 996 F.2d at 1372 ("the concept of similarity embraces not only global similarities in structure and sequence, but localized similarity in language."); *Harper & Row Publishers v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (finding infringement where defendant published magazine article which excerpted only 300400 words from President Ford's as yet unreleased memoirs). Substantial similarity, however, is a more exacting:standard in the compilation and collective work context. *See Key*, 945 F.2d at 514. Indeed, substantial similarity depends upon the copying of "those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation." *Id.* Thus, to a greater extent than in other areas of copyright law, a finding that a work shares a substantial similarity with a compilation or a collective work provides a fair, if imperfect, indicator that that work actually bears a significant resemblance to the work upon which it is based.

16. Plaintiffs would likely contend that the Court mischaracterizes the "basic function" of a newspaper or magazine by failing to appreciate that hard copy newspapers and electronic data bases are put to very different uses. Plaintiffs propose that people read newspapers to get the day's news, whereas they consult data bases and CD–ROMs for research purposes. A newspaper does not cease to be a newspaper, however, in the event that it comes to be used primarily for research purposes. Once included in the stacks of a library, for instance, a complete issue of *The New York Times* is undoubtedly still an issue of

In sum, if NEXIS was produced without the permission of The New York Times or Newsday or Time, these publishers would have valid claims of copyright infringement against MEAD. If "General Periodicals On-Disc" or "The New York Times OnDisc" was produced without the permission of The New York Times, that publisher would have a valid claim of infringement against UMI. In other words, absent a consideration such as fair use, the defendant publishers would be able to recover against the electronic defendants for creating unauthorized versions of their periodicals. *See* 17 U.S.C. § 107 (describing those circumstances in which the unauthorized creation of a substantially similar version of an original work is excused as "fair use"). The Court is unable to conclude that these electronic versions can be "substantially similar" to defendants' collective works for some purposes, without at least qualifying as "any revision[s]" of those works for present purposes. 17 U.S.C. § 201(c). This is particularly so in light of the fact that these technologies preserve this substantial similarity while retaining the basic character of the publisher defendants' periodicals.[17]

### 3. Section 201(c) And The Rights Of Authors

Plaintiffs are adamant that a ruling for defendants in this case leaves freelance authors without any significant protection under the 1976 Act. This result, according to plaintiffs, cannot be reconciled with the fact that the passage of Section 201(c)—and the dismantling of indivisibility—represented an important victory for individual authors.

As an initial matter, plaintiffs exaggerate the repercussions of this decision. The elec-tronic data bases retain a significant creative element of the publisher defendants' collective works. In numerous other conceivable circumstances, Section 201(c) would apply to prevent the exploitation, by publishers, of individual articles. The New York Times, for instance, cannot sell a freelance article to be included in *Sports Illustrated. See Quinto,* 506 F.Supp. 554; *see also* H.R. Report No. 94–1476, at 122–23 (1976), U.S.Code Cong. & Admin.News 1976, p. 5738 ("the publisher could not revise the contribution itself or include it in a new anthology or an entirely different magazine or other collective work"). A magazine publisher cannot rework a featured article into a full length book. *Cf. Oddo v. Ries,* 743 F.2d 630, 633–34 (9th Cir.1984) (explaining that magazine publisher did not acquire the exclusive right to rework plaintiffs published articles into book form). And publishers cannot create television or film versions of individual freelance contributions to their periodicals. *Cf. Abend,* 495 U.S. 207, 110 S.Ct. 1750 (prohibiting film maker from creating movie version of story first published in a magazine without the permission of the author's successor in interest). Though these scenarios are perhaps overshadowed by the seeming omnipresence of NEXIS and CD–ROM technology, authors remain protected under Section 201(c).

The Court does not take lightly that its holding deprives plaintiffs of certain important economic benefits associated with their creations. This does not result from any misapplication of Section 201(c), however, but from modern developments which have changed the financial landscape in publishing. In particular, on-line technologies and

---

*The New York Times* despite the fact that it would likely be consulted only for particular articles identified by researchers in periodical indices. In this sense, NEXIS and the CD–ROMs do not fail to reproduce versions of defendants' periodicals; they simply store those versions within something akin to an electronic research library.

**17.** Plaintiffs devote considerable attention to the arrangements entered into between the publisher defendants and the electronic defendants. For instance, plaintiffs emphasize that The New York Times, in one of its license agreements with MEAD, expressly prohibits NEXIS from producing "facsimile reproductions" of *The New York Times.* (Pl.s' Mot. Summe. J. Ex. 38 at M003642.) In its first contract with UMI, on the other hand, The New York Times grants UMI the exclusive right to reproduce full images of the newspaper and its sections. (Pl.s' Mot. Summe. J. Ex. 39 U007357.) Plaintiffs argue that such arrangements demonstrate that The New York Times recognizes that it is profiting from plaintiffs' individual articles through NEXIS, and from its larger periodical through "General Periodicals OnDisc." To the contrary, by selling different original aspects of *The New York Times* to different electronic providers—article selection in the case of MEAD, and visual layout in the case of UMI—the publisher is merely taking advantage of the fact that there is more than one way to revise a collective work.

CD–ROMs did not begin to flourish commercially until the early to mid 1980s.[18] Thus, when the Copyright Act was formulated, during the 1960s and early 1970s, the most immediate economic threat to freelance writers was not posed by computer technology, but by the sort of transactions described in the preceding paragraph—e.g. the sale of articles between magazines, television adaptations of stories, etc. Congress responded with a provision targeted to prevent such exploitation. Publishers were left with the right to revise their collective works; a right then perceived to have only limited economic value, but a right that time and technology have since made precious.

In sum, plaintiffs insist that the framers of Section 201(c) never intended the windfall for publishers permitted under this Court's ruling. This may well be. If today's result was unintended, it is only because Congress could not have fully anticipated the ways in which modern technology would create such lucrative markets for revisions; it is not because Congress intended for the term revision to apply any less broadly than the Court applies it today. In other words, though plaintiffs contend mightily that the disputed electronic reproductions do not produce revisions of defendants' collective works, plaintiffs' real complaint lies in the fact that modern technology has created a situation in which revision rights are much more valuable than anticipated as of the time that the specific terms of the Copyright Act were being negotiated. If Congress agrees with plaintiffs that, in today's world of pricey electronic information systems, Section 201(c) no longer serves its intended purposes, Congress is of course free to revise that provision to achieve a more equitable result. Until and unless this happens, however, the courts must apply Section 201(c) according to its terms, and not on the basis of speculation as to how Congress might have done things differently had it known then what it knows now. *See AB-KCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 65 (2d Cir.1996) ("what Congress may or may not do in the future to redefine [a copyright] term is not for us to speculate.").

18. *See* Sidney A. Rosenzweig, *Don't Put My Article Online!: Extending Copyright's New–Use*

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to enter judgment dismissing this action against the remaining defendants in accordance with this Opinion and Order.

**SO ORDERED.**

*Doctrine To The Electronic Publishing Media And Beyond,* 143 U. Pa. L.Rev. 899, 929 (1995).