**Barbara HORGAN, As Executrix of the Estate of George Balanchine, Plaintiff-Appellant,**

v.

**MACMILLAN, INC., Ellen Switzer, Steven Caras, and Costas, Defendants-Appellees.**

**No. 878, Docket 85–7954.**

United States Court of Appeals, Second Circuit.

Argued March 5, 1986.

Decided April 28, 1986.

Lois D. Thompson, New York City (Proskauer, Rose, Goetz & Mendelsohn, E. Gabriel Perle, of counsel), for plaintiff-appellant.

Robert J. Bernstein, New York City (Cowan, Liebowitz & Latman, P.C., Roger

L. Zissu, Jan F. Constantine, of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, and NEWMAN and WINTER, Circuit Judges.

FEINBERG, Chief Judge:

This appeal presents the novel question whether still photographs of a ballet can infringe the copyright on the choreography for the ballet. Barbara Horgan, executrix of the estate of the renowned choreographer George Balanchine, appeals from a judgment of the United States District Court for the Southern District of New York, Richard Owen, J., denying her motion for a preliminary injunction. Appellant Horgan sought to enjoin the publication of a book entitled "The Nutcracker: A Story & a Ballet," which portrays, in text and photographs, the New York City Ballet Company's production of The Nutcracker ballet, choreographed by Balanchine. Defendant Macmillan is the publisher, and defendant Ellen Switzer the author, of the book; defendants Steven Caras and Costas provided the photographs. The district court held that the book did not infringe Balanchine's copyright because choreography is the flow of steps in a ballet, which could not be reproduced from the still photographs in the book. 621 F.Supp. 1169 (S.D.N.Y.1985). The court also found that the estate had delayed unduly in seeking relief. We conclude that the district court applied the wrong legal standard for determining whether the photographs infringe the copyrighted choreography, and we remand for reconsideration utilizing the correct standard. We strongly suggest that any further hearing on the preliminary injunction be consolidated with consideration of the claim for permanent injunctive relief.

## I.

George Balanchine, who died on April 30, 1983, was director, ballet master and chief choreographer of the New York City Ballet, a company he co-founded in 1948 with Lincoln Kirstein, its present Artistic Director. It is undisputed that Balanchine was a recognized master in his field.[1] In 1954, Balanchine choreographed his own version of the ballet The Nutcracker, set to music by Tchaikovsky. The ballet is an adaptation of a 19th century folk tale by E.T.A. Hoffman, "The Nutcracker and the Mouse King," and of a previous choreographic version of that fable by the Russian choreographer Ivanov. The parties disagree on the extent to which the "Balanchine Nutcracker," as it is commonly known, incorporates preexisting material by Hoffman and Ivanov. The Balanchine Nutcracker has been performed by the New York City Ballet Company each Christmas season for the last thirty years and has become a classic. Each year, all seats for all performances are sold out. The Nutcracker, we are told, is the nation's most commercially successful ballet. The Company paid Balanchine, and then his estate, a royalty each time The Nutcracker or any other Balanchine ballet was performed. Balanchine, and then his estate, also licensed other ballet companies to perform his ballets, and other media to reproduce them, for which he received either royalties or other consideration.

In December 1981, Balanchine registered his claim to copyright in the choreography of The Nutcracker with the United States Copyright Office. As part of his claim, he deposited with the Copyright Office a videotape of a New York City Ballet Company dress rehearsal of the ballet. Under Balanchine's will, which is presently in administration, all media, performance and other rights in The Nutcracker were left to certain named legatees, including Ms. Horgan, who was his personal assistant at the New York City Ballet for 20 years.

In early April 1985, appellant Horgan learned for the first time that Macmillan was planning to publish, under its Atheneum imprint, a book about the New York

---

1. Balanchine has been described as a "genius" and as "an artist of the same magnitude as Picasso." B. Taper, Balanchine 8 (1974).

City Ballet/Balanchine version of The Nutcracker. Atheneum had sent galleys of a text and photocopies of photographs to Lincoln Kirstein, who gave the material to appellant. (Ms. Horgan continues to be employed by the New York City Ballet Company as Director of Special Projects.) According to appellees, the galleys and photocopies forwarded at that time were "virtually identical" to the final version of the book, published some six months later in October 1985.

The book is designed primarily for an audience of young people. The title page displays three black and white photographs of George Balanchine directing a rehearsal of the ballet. The book begins with a 15-page text by defendant Switzer regarding the origins of The Nutcracker as a story and as a ballet. The remainder of the book is introduced by a second title page, as follows:

THE

BALANCHINE

BALLET

As Performed by the Dancers of the New York City Ballet Company

The principal section of the book consists of 60 color photographs by Caras and Costas of scenes from the New York City Ballet Company production of The Nutcracker, following the sequence of the ballet's story and dances. The photographs are interspersed with Switzer's narration of the story, including those portions not portrayed visually. The final section of the book contains interviews with ten of the dancers, with black and white photographs of them out of costume. Defendants Switzer, Caras and Costas obtained this material through their access to company rehearsals and performances. Switzer is a free lance journalist who was apparently given such access by the press liaison for the Company. Caras and Costas are considered "official photographers" of the New York City Ballet. According to appellant, this means that Balanchine authorized

them to take photographs of the Company, some of which might be purchased by the Company for publicity and related purposes.

On the day that Horgan received the galleys, she contacted the attorney for the estate, who immediately wrote to Atheneum. The letter, dated that same date—April 3—questioned Atheneum's right to "create such a derivative work" and suggested that "in light of the Estate's ownership of the work in question," Atheneum suspend any further production expenses until "appropriate licenses" were in place. In a second letter, dated April 15, 1985, the attorney for the estate advised Macmillan's publishing counsel that Horgan was not willing to grant the necessary licenses for the book. After an exchange of correspondence, Macmillan's counsel advised the attorney for the estate, in a letter dated May 10, 1985, that Atheneum intended to proceed without Horgan's authorization. The letter stated that

after considerable thought and analysis, we have concluded that it is unnecessary for us to obtain any authorization from the Ballanchine (sic) Estate in connection with our proposed work since, as a legal matter, we are completely satisfied that the work in no way violates or infringes upon any proprietary rights of Mr. Balanchine or his successors-in-interest.

The attorney for the estate responded some three weeks later, warning Macmillan that publication would constitute a "willful violation of the rights of the Estate" and demanding immediate assurance that the book would not be published without the estate's permission. There apparently were no further significant written communications between the parties until October 8, 1985, when lawyers for the estate received from Macmillan a copy of the book in final form.

On October 11, 1985, Horgan brought suit on behalf of the estate, seeking declaratory relief and both a preliminary and permanent injunction against publication of the book. At the same time, Horgan applied for a temporary restraining order.

The district court denied the application in a memorandum endorsement dated October 17, 1985. Some five weeks later, after receiving additional papers and hearing argument, the judge denied Horgan's motion for a preliminary injunction. The judge stated, in an opinion and order substantially similar to his earlier memorandum, that the book did not infringe the copyright on Balanchine's choreography because

> choreography has to do with the flow of the steps in a ballet. The still photographs in the Nutcracker book, numerous though they are, catch dancers in various attitudes at specific instants of time; they do not, nor do they intend to, take or use the underlying choreography. The staged performance could not be recreated from them.[1]

---
[1] Just as a Beethoven symphony could not be recreated from a document containing only every twenty-fifth chord of the symphony.

621 F.Supp. at 1170 & n. 1. As a separate ground for denying preliminary injunctive relief, Judge Owen found that on May 10, 1985, Macmillan had "unequivocally notified" Horgan that it was going to proceed with the book despite her objections. Since Horgan took no action until Macmillan had already changed its position by printing the book, the scales were tipped in Macmillan's favor. This appeal followed.

## II.

The principal question on appeal, whether still photographs of a ballet can infringe the copyright on the choreography for the ballet, is a matter of first impression. Explicit federal copyright protection for choreography is a fairly recent development, and the scope of that protection is an uncharted area of the law. The 1976 Copyright Act (the Act), 17 U.S.C. § 101 et seq., was the first federal copyright statute expressly to include "choreographic works" as a subject of protection.[2] Choreography was not mentioned in the prior law, the 1909 Copyright Act, 61 Stat. 652, and could only be registered, pursuant to regulations issued under that law, as a species of "dramatic composition." Dance was protectible only if it told a story, developed or characterized an emotion, or otherwise conveyed a dramatic concept or idea. G. Ordway, Choreography and Copyright, 15 ASCAP Copyright Law Symposium 172, 177–78 & n. 20 (1967); Mirell, Legal Protection for Choreography, 27 N.Y.U.L.Rev. 792, 800–13 (1952). The rights of a choreographer in his work were not clearly defined, in part because the means for reducing choreography to tangible form had become readily available only comparatively recently, id. at 792–93 & nn. 4, 5, and in part because of resistance to the acceptance of abstract, non-literary dance as a worthy form of artistic expression. Id. at 806–07. See also Comment, Moving to a New Beat: Copyright Protection for Choreographic Works, 24 U.C.L.A.L.Rev. 1287, 1288–94 (1977).[3]

There were numerous proposals over the years to amend the copyright law to include coverage for abstract choreographic works, but none were successful. Study No. 28, Copyright in Choreographic Works 99–100 (B. Varmer), reprinted in Register of Copyrights, 87th Cong., 1st Sess., Report on the General Revision of the U.S. Copyright Law (Comm. Print 1961). In a comprehensive report on revision of the copyright laws, the Copyright Office recommended to Congress in 1961 that the law be amended to insure protection for "abstract" as well as traditional dramatic ballet. Report of the Register of Copyrights, supra at 17. Choreography had long held an important position in the entertainment

---
2. The statute provides in relevant part:

> (a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

> (4) pantomimes and choreographic works
> ....

17 U.S.C. § 102(a)(4).

3. The cited Comment describes the Laban system of notation, and refers to the Benesh system; in addition, film and video tape are now available.

and artistic worlds, yet the "economic remuneration of choreographers" had not kept pace "with their creative achievements." Comment, Moving to a New Beat, supra at 1287.[4] By including choreographic works as a separate copyrightable form of expression, the 1976 Act broadened the scope of its protection considerably.

The Act does not define choreography, and the legislative reports on the bill indicate only that "social dance steps and simple routines" are not included. See, e.g., H.R.Rep. No. 1476, 94th Cong., 2d Sess. 53–54, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5666–67. The Compendium of Copyright Office Practices, Compendium II (1984), which is issued by that office, defines choreographic works as follows:

> Choreography is the composition and arrangement of dance movements and patterns, and is usually intended to be accompanied by music. Dance is static and kinetic successions of bodily movement in certain rhythmic and spatial relationships. Choreographic works need not tell a story in order to be protected by copyright.

Section 450.01. Under "Characteristics of choreographic works," Compendium II states that

> Choreography represents a related series of dance movements and patterns organized into a coherent whole.

Section 450.03(a). "Choreographic content" is described as follows:

> Social dance steps and simple routines are not copyrightable.... Thus, for example, the basic waltz step, the hustle step, and the second position of classical ballet are not copyrightable. However, this is not a restriction against the incor-

poration of social dance steps and simple routines, as such, in an otherwise registrable choreographic work. Social dance steps, folk dance steps, and individual ballet steps alike may be utilized as the choreographer's basic material in much the same way that words are the writer's basic material.

Section 450.06. The Act grants the owner of a copyrighted original work that is "fixed in any tangible medium of expression," 17 U.S.C. § 102(a), the exclusive right "to reproduce the copyrighted work in copies ...," "to prepare derivative works based upon the copyrighted work" and, "in the case of ... choreographic works, ... to display the copyrighted work publicly." 17 U.S.C. § 106(1), (2) & (5). Appellant claims that the Switzer book is a "copy" of Balanchine's copyrighted work because it portrays the essence of the Balanchine Nutcracker, or, in the alternative, that the book is an infringing "derivative work."[5] The test for infringement, appellant asserts, is not whether the original work may be reproduced from the copy—as the district judge held—but whether the alleged copy is substantially similar to the original. *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966).

In response, appellees assert that the photographs in the Switzer book do not capture the flow of movement, which is the essence of dance, and thus cannot possibly be substantially similar to the choreographic component of the production of the ballet. Appellees rely on the various definitions of choreography in Compendium II, quoted above, to support their position that the central characteristic of choreography

---

**4.** The Comment cited in the text described the plight of Agnes De Mille, choreographer of the musical "Oklahoma!", as follows:

> Since copyright protection was not available for her work, she initially received $15,000 but no royalties for her work. Yet in various adaptations and still using her choreography, *Oklahoma!* is estimated to have earned over $60 million during a period of fifteen years. In contrast to Ms. De Mille's small remuneration, Rodgers and Hammerstein, who collaborated on the musical score, still receive royalties every time a tune from the musical is

played on radio, television, or for a live and paying audience.

Id. at 1287 n. 4.

**5.** The Act defines a derivative work as one

> based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.

17 U.S.C. § 101.

is "movement." According to appellees, since each photograph in the book captures only a fraction of an instant, even the combined effect of 60 color photographs does not reproduce the choreography itself, nor provide sufficient details of movement to enable a choreographic work to be reproduced from the photographs.

Appellees also argue that little, if anything, of Balanchine's original choreographic contribution to the New York City Ballet production of The Nutcracker is shown in the photographs. That production, they contend (and appellant does not disagree entirely here), is based on extensive preexisting material by Hoffman and Ivanov that is in the public domain and not subject to copyright. According to appellees, the Switzer book is composed primarily of a combination of material in the public domain and the special non-choreographic aspects of the New York City Ballet production—the costumes by Karinska and the sets by Rouben Ter-Artunian, both produced under licensing agreements between those artists and the Company. Appellant makes no claim to those components of the production, and appellees assert that the choreography—even if it were conveyed by the photographs—is visually indistinguishable from the integrated whole of the production. Appellees thus argue that the book does not infringe any copyrighted or copyrightable choreographic material.

### III.

■ The question whether the photographs in the Switzer book infringe the copyright on Balanchine's choreography is not a simple one, but we agree with appellant that in resolving that issue the district court applied an incorrect test. The district judge found no infringement because the photographs catch only "dancers in various attitudes at specific instants of time," rather than "the flow of the steps in a ballet," and thus "[t]he staged performance could not be recreated" from the photographs.

621 F.Supp. at 1170. However, the standard for determining copyright infringement is not whether the original could be recreated from the allegedly infringing copy, but whether the latter is "substantially similar" to the former. *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092–93 (2d Cir.1977); *Ideal Toy*, supra, 360 F.2d at 1022; *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487 (2d Cir.1960). The test, as stated by Judge Learned Hand in *Peter Pan*, is whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." Id. at 489.

■ When the allegedly infringing material is in a different medium, as it is here, recreation of the original from the infringing material is unlikely if not impossible, but that is not a defense to infringement. See, e.g., *King Features Syndicate v. Fleischer*, 299 F. 533, 535 (2d Cir.1924) (cartoon character infringed by toy doll); *Filmvideo Releasing Corp. v. Hastings*, 509 F.Supp. 60, 63–65, aff'd in part, rev'd in part, 668 F.2d 91 (2d Cir.1981) (books infringed by movies). It surely would not be a defense to an infringement claim against the movie version of "Gone With The Wind" that a viewer of the movie could not create the book. Even a small amount of the original, if it is qualitatively significant, may be sufficient to be an infringement, although the full original could not be recreated from the excerpt. See, e.g., *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1145 (S.D.N.Y.1980), aff'd, 672 F.2d 1095 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), and *Elsmere Music, Inc. v. National Broadcasting Co.*, 482 F.Supp. 741, 744 (S.D.N.Y.), aff'd, 623 F.2d 252 (2d Cir.1980). In the former case, short film clips used in a film memorial to Charlie Chaplin were held to infringe full length films.[6] In the latter, the use of four notes from a musical com-

---

6. Indeed, the trial judge in *Roy Export* said, "I would think there would be a substantial taking of 'Gone with the Wind' if someone just took the burning of Atlanta ... ten or fifteen minutes of a three or four hour movie." *Id.* at 1145.

position containing one hundred measures was held sufficient to infringe the copyrighted original.[7]

Moreover, the district judge took a far too limited view of the extent to which choreographic material may be conveyed in the medium of still photography. A snapshot of a single moment in a dance sequence may communicate a great deal. It may, for example, capture a gesture, the composition of dancers' bodies or the placement of dancers on the stage. Such freezing of a choreographic moment is shown in a number of the photographs in the Switzer book, e.g., at pp. 30, 38, 42, 66–67, 68, 69, 74, 75, 78, 80, and 81. A photograph may also convey to the viewer's imagination the moments before and after the split second recorded. On page 76–77 of the Switzer book, for example, there is a two-page photograph of the "Sugar Canes," one of the troupes that perform in The Nutcracker. In this photograph, the Sugar Canes are a foot or more off the ground, holding large hoops above their heads. One member of the ensemble is jumping through a hoop, which is held extended in front of the dancer. The dancer's legs are thrust forward, parallel to the stage and several feet off the ground. The viewer understands instinctively, based simply on the laws of gravity, that the Sugar Canes jumped up from the floor only a moment earlier, and came down shortly after the photographed moment. An ordinary observer, who had only recently seen a performance of The Nutcracker, could probably perceive even more from this photograph. The single instant thus communicates far more than a single chord of a Beethoven symphony—the analogy suggested by the district judge.

■ It may be that all of the photographs mentioned above are of insufficient quantity or sequencing to constitute in-

fringement; it may also be that they do copy but also are protected as fair use. But that is not what the district judge said in denying a preliminary injunction. The judge erroneously held that still photographs cannot infringe choreography. Since the judge applied the wrong test in evaluating appellant's likelihood of success on the preliminary injunction, we believe that a remand is appropriate. But since further proceedings in the district court will be necessary, we strongly suggest that the parties proceed promptly toward a final judgment on the merits upon an adequate record. The validity of Balanchine's copyright,[8] the amount of original Balanchine choreography (rather than Ivanov's) in the New York City Ballet production of The Nutcracker and in the photographs, and the degree to which the choreography would be distinguishable in the photographs without the costumes and sets (in which appellant claims no right) are all matters still to be determined, preferably on a fuller record including expert testimony, which we assume would be of considerable assistance. The same is true with respect to appellees' claim that the New York City Ballet Company, as either sole or joint owner with the estate of the choreography, authorized the publication of the Switzer book and the use of the photographs. Appellants respond that Balanchine alone, and now his estate, have the exclusive right to license the use of his works, as evidenced by the royalties paid him by the Company over the years. The district court did not rule on this issue, and, on the record before us, there is considerable confusion about the overlapping proprietary rights of Balanchine's estate, the New York City Ballet Company and the "official photographers," including defendants Caras and Costas.

---

**7.** Although the district court in *Elsmere* rejected the argument that the defendant's use of the copyrighted material was "merely a *de minimis* taking," 482 F.Supp. at 744, the court found that there was no infringement in that case because defendant's parody of the plaintiff's jingle constituted a fair use. 482 F.Supp. at 747.

**8.** Appellees question the validity of Balanchine's copyright on the ground that the application failed to refer to preexisting material.

Finally, appellees contend that appellant's delay in suing should bar injunctive relief, as the district court held. Appellant argues that "[p]arties should not be encouraged to sue before a practical need to do so has been clearly demonstrated," *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 435 (S.D. N.Y.1980); *Selchow & Righter Co. v. Book-of-the-Month Club, Inc.*, 192 U.S.P.Q. 530, 532 (S.D.N.Y.1976). In response, appellees claim that when a copyright holder has definitive advance knowledge of a planned infringement, yet fails to take legal action, and the defendant changes its position to its detriment, preliminary injunctive relief may be denied. See *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985). There is a factual dispute here over whether "a practical need" to sue had been *clearly* demonstrated prior to October 1985, and we are not certain whether the district court examined the question closely enough. The judge's opinion states that appellant was aware of Macmillan's "general intentions" as early as April 3, but knowledge of a general nature is not sufficient basis for judicial intervention. Appellees claim that the materials they sent Kirstein at that time were "virtually identical" to the book as published, but appellant asserts she expected the proposed book to be modified in response to her warning. She also indicates that she tried to get an advance copy of the book, but this was "not so easy" to do. In any event, in view of our holding that the district judge applied the wrong standard of law on infringement and our strong view that this case should proceed to a final disposition on the merits rather than to merely a reconsideration of the motion for a preliminary injunction, the issue of plaintiff's allegedly undue delay becomes less significant. As we pointed out in *Citibank*, "a particular period of delay" may be sufficient to justify denial of a preliminary injunction but still "not rise to the level of laches and thereby bar a permanent injunction." Id. at 276. Accordingly, we do not believe it fruitful to address the issue further at this time.

We reverse and remand for further proceedings consistent with this opinion.