[**PUBLISH**]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 22, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-10510

_____

D. C. Docket No. 97-03924-CV-JAL


JERRY GREENBERG,
IDAZ GREENBERG,

                                    Plaintiffs-Appellants,

    versus

NATIONAL GEOGRAPHIC SOCIETY,
a District of Columbia Corporation,
NATIONAL GEOGRAPHIC ENTERPRISES, INC.,
a corporation, MINDSCAPE, INC.,
a California corporation,

                                    Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 22, 2001)


Before ANDERSON, Chief Judge, TJOFLAT and BIRCH, Circuit Judges.

BIRCH, Circuit Judge:

This appeal requires us, as a matter of first impression in this circuit, to construe the extent of the privilege afforded to the owner of a copyright in a collective work to reproduce and distribute the individual contributions to the collective work "as part of that particular collective work, any revision of that collective work, and any later collective work in the same series" under 17 U.S.C. § 201(c).[1] In this copyright infringement case, the district court granted the defendants' motion for summary judgment, holding that the allegedly infringing work was a revision of a prior collective work that fell within the defendants' privilege under § 201(c). Because we find that the defendants' product is not merely a revision of the prior collective work but instead constitutes a new collective work that lies beyond the scope of § 201(c), we **REVERSE**.

## I. BACKGROUND

The National Geographic Society ("Society") purports to be the world's largest nonprofit scientific and educational organization at approximately 9.5 million members, and is responsible for the publication of National Geographic Magazine ("Magazine"). Through National Geographic Enterprises, a wholly owned, for-profit subsidiary, the Society also produces television programs and

---

[1]Hereafter, all references to statutory sections ("§") will be to Title 17 of the United States Code, unless indicated otherwise.

computer software, along with other educational products.  In order to acquire photographs for the Magazine and its other publications, the Society hires freelance photographers on an independent-contractor basis to complete specific assignments.

Jerry Greenberg is a photographer who completed four photographic assignments for the Society over the course of 30 years.  Photographs from the first three assignments were published in the January 1962, February 1968, and May 1971 issues of the Magazine, respectively.  The terms of Greenberg's employment for these assignments were set out in a series of relatively informal letters. Greenberg received compensation consisting of a daily fee, a fee based on the number of photographs published, and payment of expenses, and in return the Society acquired all rights in any photograph taken on the jobs that was ultimately selected for publication in the Magazine.  In 1985, at Greenberg's request, the Society reassigned its copyrights in the pictures from these three jobs back to Greenberg.  Greenberg's fourth hire for the Society appeared in the July 1990 issue of the Magazine, but the agreement for this job was more detailed than its predecessors.  The principle terms of the fourth agreement were similar to those of the first three; however, in this agreement it was explicitly provided that all rights

that the Society acquired in the photographs from the job would be returned to Greenberg 60 days after the pictures were published in the Magazine.

In 1996, the Society, in collaboration with Mindscape, Inc., began the development of a product called "The Complete National Geographic" ("CNG"), which is a 30 CD-ROM library that collects every[2] issue of the Magazine from 1888 to 1996 in digital format. There are three components of the CNG that are relevant to this appeal: (1) the moving covers sequence ("Sequence"); (2) the digitally reproduced issues of the Magazine themselves ("Replica"); and (3) the computer program that serves as the storage repository and retrieval system for the images ("Program").

The Sequence is an animated clip that plays automatically when any disc from the CNG library is activated. The clip begins with the image of an actual cover of a past issue of the Magazine. This image, through the use of computer animation, overlappingly fades ("morphs") into the image of another cover, pauses on that cover for approximately one second, and then morphs into another cover image, and so on, until 10 different covers have been displayed. One of the cover images used in the moving covers sequence is a picture of a diver that was taken by

[2]The Society publishes multiple regional and international editions of each issue of the Magazine. These various editions differ from one another in the language in which they are written and the advertisements that are printed. The CNG includes only one representative edition of each issue.

Greenberg in 1961.  The entire sequence lasts for 25 seconds, and is accompanied by music and sound effects.

The collected issues of the Magazine, which are, of course, the CNG's *raison d'être*, were converted to digital format through a process of scanning each cover and page of each issue into a computer.  What the user of the CNG sees on his computer screen, therefore, is a reproduction of each page of the Magazine that differs from the original only in the size and resolution of the photographs and text. Every cover, article, advertisement, and photograph appears as it did in the original paper copy of the Magazine.  The user can print out the image of any page of the Magazine, but the CNG does not provide a means for the user to separate the photographs from the text or otherwise to edit the pages in any way.

The Program, which was created by Mindscape, is the element of the software that enables the user to select, view, and navigate through the digital "pages" of the Magazine Replica on the CD-ROM.  In creating the Program for the CNG, Mindscape incorporated two separate programs: the CD Author Development System ("CDA"), which is a search engine created by Dataware Technologies, Inc.; and the PicTools Development Kit ("PicTools"), which is a program for compressing and decompressing images that was created by Pegasus

Imaging Corp.[3]  The CNG package contains a "shrink-wrap" license agreement in which "all rights [in the Program] not expressly granted are reserved by Mindscape or its suppliers."  Without the Program, the Replica could still be stored on a CD-ROM, but the individual "pages" of the Magazine would not be efficiently accessible to the user of the CNG.

Prior to placing the CNG on the market, the Society dispatched a letter to each person who had contributed to the Magazine.  This letter informed the contributors about the CNG product and stated the Society's position that it would not provide the contributors with any additional compensation for the digital republication and use of their works.  Greenberg contends that he responded to this notice through counsel and objected to the Society's use of his photographs in the CNG, but he received no response from the Society.

---

[3]Mindscape indicates that it has not registered a claim of copyright in the Program, which is manifestly copyrightable. See §§ 101 (defining "computer program"), 102; Montgomery v. Noga, 168 F.3d 1282, 1288 (11th Cir. 1999).  However, copyright arises by operation of law upon fixation of an original work of authorship in a tangible medium of expression, which has clearly occurred in the case of the Program. See § 102; Montgomery, 168 F.3d at 1288. Moreover, Mindscape has represented to this court that two component elements of the Program, the CDA and PicTools, each of which are separately copyrightable computer programs, have been registered with the Copyright Office by Dataware Technologies, Inc., and Pegasus Imaging Corp., respectively.  Because it consists of at least two other individually copyrighted works, the Program meets the definition of both a "compilation" and a "collective work" under §101 of the Act.

The Society sought registration for its claim of copyright for the CNG in 1998, but noted 1997 as the year of its completion. On the registration form,[4] the Society indicated that the "nature of authorship" included photographs, text, and an "introductory audiovisual montage." The Society claimed that the work had not been registered before, but indicated that it was a derivative work, namely a "compilation of pre-existing material primarily pictorial," to which a "brief introductory audiovisual montage" had been added. No reference was made to, nor was there any disclosure of, the copyrightable Mindscape Program or the two pre-existing, copyrightable sub-programs that it incorporates, all of which are also components of the CNG. The box in which the CNG is packaged and each individual CD-ROM bear the mark "© 1997 National Geographic Society"–indicating the creation of a new work of authorship in 1997.

Greenberg initiated an infringement action against the Society, National Geographic Enterprises, and Mindscape, alleging five counts of copyright infringement, two of which are relevant here: count "III" addressed the Society's reuse of Greenberg's photographs in the CNG, generally, and count "V" specifically addressed the use of his diver photograph in the Sequence. The Society, together with the two other defendants, moved for summary judgment on

_____

[4]A copy of the registration form (application), which when approved by the Copyright Office became the registration certificate, is attached hereto as Appendix A.

7

counts III-V, arguing that it had a privilege under § 201(c) to reproduce and distribute Greenberg's photographs in the CNG because it owned the copyright in the original issues of the Magazine in which the photographs appeared.[5] Greenberg filed a cross-motion for summary judgment on count III. The district court, relying on the district court opinion in Tasini v. New York Times Co., 972 F.Supp. 804 (S.D.N.Y. 1997), rev'd 206 F.3d 161 (2d Cir. 2000), cert. granted, 69 U.S.L.W. 3312, 3316 (U.S. Nov. 6, 2000) (No. 00-201), held that the CNG constituted a "revision" of the paper copies of the Magazine that was within the Society's privilege under § 201(c), and accordingly granted summary judgment for all of the defendants on counts III-V. The district court later dismissed counts I and II, which did not relate to the CNG, at the parties' joint request. The Greenbergs appeal the district court's judgment only as to counts III and V.

## II. DISCUSSION

To evaluate the claims of infringement leveled by Greenberg against the defendants,[6] we must interpret and apply § 201(c) of the Act. That section

---

[5]There is no evidence in the record that would support the theory that National Geographic Enterprises or Mindscape, neither of which has a copyright interest in the original issues of the Magazine, somehow are privy to the privilege in § 201(c) enjoyed by the Society.

[6]In the Amended Complaint, Greenberg refers to Mindscape's and National Geographic Enterprises's liability as "at least vicarious." We construe this as an allegation of contributory copyright infringement. A contributory copyright infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 845 (11th

constitutes the sole basis and defense of the Society's use of Greenberg's

copyrighted photographs. In all cases involving copyright law, we understand that

any interpretation and application of the statutory law must be consistent with the

copyright clause of the United States Constitution; specifically, the eighth clause of

the eighth section of Article I. That clause is a limitation, as well as a grant, of the

copyright power.[7] The copyright clause, consisting of twenty-four words crafted

by our founding fathers, is the Rosetta Stone for all statutory interpretation and

---

Cir. 1990) (citations omitted). Accordingly, there can be no contributory infringement without a finding that there was direct copyright infringement by another party. Id.

Further, the CNG appears to be a "joint work," which is defined under § 101 as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." Here the two "authors," the Society and Mindscape ("authors" under the legal fiction created in § 201(b)), clearly intended their contributions of the Sequence, Replica, and Program to function and be presented as a unitary whole. The CNG also fits the definition of a "collective work" under § 101; that is, "a work . . . in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." The concept of the "collective work" is included within the term "compilation," which is defined in § 101 as "a work formed by the collection and assembling of preexisting materials . . . that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." Whether the CNG is considered a "joint work" or a "collective work" makes no difference in our analysis because under each definition, a work results that is copyrightable as an entity separate and distinct from its constituent, pre-existing, separately copyrightable contributions.

[7]See Paul J. Heald and Suzanna Sherry, "Implied Limits on the Legislative Power: the Intellectual Property Clause as an Absolute Constraint on Congress," 2000 U. ILL. L. REV. 1119 (2000).

analysis. Accordingly, it is upon that predicate that we examine § 201(c) in the context of this case.[8]

The Society conceded that it has used Greenberg's photographs in a way that is inconsistent with his exclusive rights as an author under § 106.[9] However, the Society contends that it is privileged to make such use of the photographs under § 201(c), and therefore does not violate such exclusive rights and thus is not an

---

[8]Appreciation of fundamental principles is required in all areas of the law, but is particularly important in the copyright arena. As observed by Professor L. Ray Patterson's opening remarks in his insightful article entitled "Understanding the Copyright Clause," 47 J. COPYRIGHT SOC'Y 365 (2000):

> Probably few industries as large as the copyright industry have rested on a legal foundation as slim as the twenty-four words of the copyright clause. And probably no foundation of comparable importance has been so little understood and so often ignored. This is all the more surprising because the components of the copyright industry–information/learning/entertainment–are so important to a free society, and because the history of the copyright clause is so well documented.

Id. at 365. The copyright clause provides: "The Congress shall have Power . . . To promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings." U.S. CONST. art. I, § 8, cl. 8.

[9]Section 106 reserves to the owner of a copyright the rights:
1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

infringer under § 501(a).  Subpart "c" of § 201, entitled "Ownership of Copyright," provides:

> **(c) Contributions to Collective Works.**–Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution.  In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

In the context of this case, Greenberg is "the author of the contribution" (here each photograph is a contribution) and the Society is "the owner of copyright in the collective work" (here the Magazine).  Note that the statute grants to the Society "only [a] privilege," not a right.  Thus the statute's language contrasts the contributor's "copyright" and "any rights under it" with the publisher's "privilege."  This is an important distinction that militates in favor of narrowly construing the publisher's privilege when balancing it against the constitutionally-secured rights of the author/contributor.

The Society argues that its use of Greenberg's photographs constitutes a "revision" of the Magazine ["that collective work"], referring to the CNG as the compendium of over 1200 independent back issues, i.e. in copyright terms, a collective work of separate and distinct collective works, arranged in chronological order.  The Society argues that its use of Greenberg's photographs constitutes a

11

"revision" of the Magazine ["that collective work"], referring to the CNG as the compendium of over 1,200 independent back issues; in copyright terms, a collective work of separate and distinct collective works, arranged in chronological order.[10]  Assuming arguendo, but expressly not deciding, that 201(c)'s revision privilege embraces the entirety of the Replica portion of the CNG (the 1,200 issues, as opposed to each separate issue of the Magazine), we are unable to stretch the phrase "that particular collective work" to encompass the Sequence and Program elements as well.  In layman's terms, the instant product is in no sense a "revision."  In this case we do not need to consult dictionaries or colloquial meanings to understand what is permitted under § 201(c).  Congress in its legislative commentary spelled it out in the concluding paragraph of its discussion of § 201(c) (which is identical in both the Senate and House versions):[11]

> The basic presumption of section 201(c) is fully consistent with present law and practice, and represents a fair balancing of equities.  At the same time, the last clause of the subsection, under which the privilege of republishing the contribution under certain limited circumstances would be presumed, is an essential counterpart of the basic presumption.  Under the language of

---

[10]It does not satisfy the definition of "compilation" since inclusion of all issues of a publication in chronological order does not satisfy the minimum creativity necessary for the selection, coordination, or arrangement that would result in an original work of authorship.  See Warren Publ'g, Inc. v. Microdos Data Corp., 115 F.3d 1509, 1518-19 (11th Cir. 1997) (en banc) (holding that work incorporating "entire relevant universe" did not exhibit sufficient creativity in selection to merit copyright protection as a compilation).

[11]A reproduction of the entire discussion in the House and Senate Reports is set out in Appendix B.

this clause a publishing company could reprint a contribution from one issue in a later issue of its magazine, and could reprint an article from a 1980 edition of an encyclopedia in a 1990 revision of it, **the publisher could not** revise the contribution itself or **include it in** a new anthology or **an** entirely different magazine or **other collective work**.

H.R. Rep. No. 94-1476, at 122-23 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5738 (emphasis added).

As discussed above, the CNG is an "other collective work" composed of the Sequence, the Replica, and the Program. However, common-sense copyright analysis compels the conclusion that the Society, in collaboration with Mindscape, has created a new product ("an original work of authorship"), in a new medium, for a new market that far transcends any privilege of revision or other mere reproduction envisioned in § 201(c).[12]

This analysis is totally consistent with the conduct of the Society when it registered its claim of copyright in the CNG (under the title "108 Years of National

_____

[12]The Society characterizes this case as one in which there has merely been a republication of a preexisting work, without substantive change, in a new medium; specifically, digital format. As discussed in the text, however, this case is both factually and legally different than a media transformation. The Society analogizes the digitalization of the Magazine to the reproduction of the Magazine on microfilm and microfiche. While it is true that both the digital reproductions and the microfilm/microfiche reproductions require a mechanical device for viewing them, the critical difference, from a copyright perspective, is that the computer, as opposed to the machines used for viewing microfilm and microfiche, requires the interaction of a computer program in order to accomplish the useful reproduction involved with the new medium. These computer programs are themselves the subject matter of copyright, and may constitute original works of authorship, and thus present an additional dimension in the copyright analysis. Because this case involves not only the incorporation of a new computer program, but also the combination of the Sequence and the Replica, we need not decide in this case whether the addition of only the Program would result in the creation of a new collective work.

13

Geographic on CD-ROM"). Under section "5" of the copyright registration form, in response to the question: "Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?"; the Society replied, "No." Accordingly, this was a new work. Registrations had already been made relative to individual issues of the Magazine. Under section "6", subpart "a", the Society described the work (the CNG) as a "Compilation of pre-existing material primarily pictorial." Under section "6", subpart "b", which requested, "Material added to this work. Give a brief, general statement of the material that has been added to this work and in which copyright is claimed," the Society wrote "Brief introductory audiovisual montage." See Appendix A.[13] Thus, even the Society admitted that the registered work, the CNG, was a compilation. Recall that a collective work is included in the definition of compilation and embraces those works wherein its separate components are each themselves copyrightable–as are the Sequence, Replica, and Program (the "pre-existing materials" referred to in part [only the Replica was disclosed] by the Society in section "6".). Accordingly, in the words of the legislative report, "the publisher [the Society] could not . . .

---

[13]As noted earlier, the Society failed to indicate the third, and critical, element of the new work, the Program. While the storage and retrieval system may be "transparent" to the unsophisticated computer user, it nevertheless is present and integral to the operation and presentation of the data and images viewed and accessed by the user. Giving the Society the benefit of the doubt, it may not have intentionally perpetrated a fraud on the Copyright Office.

14

include [the contribution (the photographs)] in a new anthology . . . or other collective work [the CNG]." Thus in creating a new work the Society forfeited any privilege that it *might*[14] have enjoyed with respect to only one component thereof, the Replica.

With respect to the Sequence and its unauthorized use of Greenberg's diver photograph, we find that the Society has infringed upon the photographer's exclusive right under § 106(2) to prepare derivative works based upon his copyrighted photograph. The Society has selected ten preexisting works, photographs included in covers of ten issues of the Magazine, including Greenberg's, and transformed them into a moving visual sequence that morphs one

---

[14]We indicate "*might*" because a persuasive argument can be made that when the Replica portion of the CNG was converted from text and picture images on a page to electronic, digital format, the statutory definition of a "derivative work" was not satisfied. A "derivative work" is defined under § 101 as:

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, **or any other form in which a work may be recast, transformed**, or adapted. A work consisting of editorial **revisions**, annotations, elaborations, or other modifications which, **as a whole**, represent an original work of authorship, is a "derivative work".

(Emphasis added). Note that in order to qualify as a derivative work, the resulting work (including "revisions") after transformation must qualify as an "original work of authorship." Thus, the mere electronic digital reproduction that represents the Replica may not qualify as a derivative work, and thus not violate Greenberg's exclusive right to prepare derivative works under § 106. See supra note 10. This derivative-works issue may be addressed by the Supreme Court in Tasini v. New York Times Co., 972 F.Supp. 804 (S.D.N.Y. 1997), rev'd 206 F.3d 161 (2d Cir. 2000), cert. granted, 69 U.S.L.W. 3312, 3316 (U.S. Nov. 6, 2000) (No. 00-201). But here, as explained above, we have far more than a mere reproduction in another medium.

15

into the other over a span of approximately 25 seconds.  Moreover, the Society

repositioned Greenberg's photograph from a horizontal presentation of the diver

into a vertical presentation of that diver.  Manifestly, this Sequence, an animated,

transforming selection and arrangement of preexisting copyrighted photographs

constitutes at once a compilation, collective work, and, with reference to the

Greenberg photograph, a derivative work.  See Warren Publ'g, 115 F.3d at 1515

n.16.

The Society argues that its use of Greenberg's diver photograph was a fair

use under § 107.[15]  Guided by the principles explained in Campbell v. Acuff-Rose

Music, Inc., 510 U.S. 569, 114 S.Ct. 1164 (1994),[16] we find that the Society has

neither a fair use defense or right.  See Bateman v. Mnemonics, Inc., 79 F.3d 1532,

1542 n.22 (11th Cir. 1996); David Nimmer, "An Odyssey through Copyright's

Vicarious Defenses," 73 N.Y.U. L. REV. 162, 191 (1998).  The use of the diver

---

[15]Among the factors to be considered in determining whether a use of a copyrighted work
is a "fair use" are:
    (1) the purpose and character of the use, including whether such use is of a commercial
    nature or is for nonprofit educational purposes;
    (2) the nature of the copyrighted work;
    (3) the amount and substantiality of the portion used in relation to the copyrighted work
    as a whole; and
    (4) the effect of the use upon the potential market for or value of the copyrighted work.
17 U.S.C. § 107.

[16]In Campbell, the Supreme Court indicated that the statutory factors in § 107 should not
"be treated in isolation, one from another.  All are to be explored, and the results weighed
together, in light of the purposes of copyright."  510 U.S. at 578, 114 S.Ct. at 1170-71.

photograph far transcended a mere reprinting or borrowing of the work. As explained above, it became an integral part of a larger, new collective work. The use to which the diver photograph was put was clearly a transformative use. The Sequence reflects the transformation of the photograph as it is faded into and out of the preceding and following photographs (after having turned the horizontal diver onto a vertical axis). The Sequence also integrates the visual presentation with an audio presentation consisting of copyrightable music. The resultant moving and morphing visual creation transcends a use that is fair within the context of § 107. Moreover, while the CNG is a product that may serve educational purposes, it is marketed to the public at book stores, specialty stores, and over the Internet. The Society is a non-profit organization, but its subsidiary National Geographic Enterprises, which markets and distributes the CNG, is not; the sale of the CNG is clearly for profit. Finally, the inclusion of Greenberg's diver photograph in the Sequence has effectively diminished, if not extinguished, any opportunity Greenberg might have had to license the photograph to other potential users.[17]

Alternatively, the Society contends that its use of Greenberg's diver photograph, which appeared on the cover of the January 1962 issue of the

---

[17]The inclusion by the Society of Greenberg's photograph in a newly copyrighted work, the Sequence, clearly indicates that the Society claims certain copyright rights in the photograph, with which potential licensees or assignees of the photograph would have to be concerned.

Magazine, constitutes a de minimis use and thus is not actionable.  We find no merit in that argument in the context of this derivative and collective work, the Sequence.

In assessing a de minimis defense, we must examine both the *quality* and *quantity* of the use.[18]  Greenberg's photograph is one of ten selected and arranged by the Society and constitutes one-tenth of the entire Sequence; a pro-rata share.  Thus, when comparing the entire work with the contribution at issue, it clearly represents a significant portion of the new work.  This is particularly accentuated in a qualitative way when we consider that only ten covers from a universe of some 1200 covers of the Magazine, embracing 108 years of publication, were selected for this composition.  Moreover, the instruction materials that accompany the CD-ROM discs inside the CNG product box refer to the Sequence as "The Complete National Geographic **icon**" (emphasis added). **[R1-20-Ex.A]**

Each and every time a user of the CNG views any of the 30 discs, the user views the Sequence–the projection of the Sequence is automatic without any prompting from the user.  Thus, the use of the Sequence in the context of the entire

---

[18]See Horgan v. MacMillan, Inc., 789 F.2d 157, 162 (2d Cir. 1986) ("Even a small amount of the original, if it is qualitatively significant, may be sufficient to be an infringement."); Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co., 900 F.Supp. 1287, 1300 (C.D.Cal. 1995) ("[T]he court must look to the quantitative and qualitative extent of the copying involved.").

CNG is not a de minimis use that fails to reach the threshold of actionable copyright infringement. The two cases principally relied upon by the Society, Ringgold v. Black Entm't Television, Inc., 126 F.3d 70 (2d Cir. 1997), and Amsinck v. Columbia Pictures Indus., Inc., 862 F.Supp. 1044 (S.D.N.Y. 1994), are not to the contrary. The "iconic" display at the beginning of each disc in the CNG product argues against the suggestion that the use of the Sequence in the CNG or the use of the Greenberg diver photograph in the Sequence is inconsequential. Accordingly, because we find the unauthorized use of the subject photograph to be both qualitatively and quantitatively significant, we reject the de minimis defense advanced by the Society and its putative co-infringers.

## III. CONCLUSION

We conclude that the unauthorized use of the Greenberg photographs in the CNG compiled and authored by the Society constitutes copyright infringement that is not excused by the privilege afforded the Society under § 201(c). We also find that the unauthorized use of Greenberg's diver photograph in the derivative and collective work, the Sequence, compiled by the Society, constitutes copyright infringement, and that the proffered de minimis use defense is without merit. Upon remand, the court below is directed to enter judgment on these copyright claims in favor of Greenberg. Counsel for the appellant should submit its

19

documented claims for attorneys fees relative to this appeal to the district court for review and approval. We find the appellant to be the prevailing party on this appeal and, therefore, is entitled to an award of costs and attorneys fees. Upon remand, the district court should ascertain the amount of damages and attorneys fees that are due as well as any injunctive relief that may be appropriate. In assessing the appropriateness of injunctive relief, we urge the court to consider alternatives, such as mandatory license fees, in lieu of foreclosing the public's computer-aided access to this educational and entertaining work.

**REVERSED** and **REMANDED.**

## APPENDIX A

## COPYRIGHT REGISTRATION FORM FOR
## THE COMPLETE NATIONAL GEOGRAPHIC

FORM VA
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE
RE

VA 931-760

EFFECTIVE DATE OF REGISTRATION

JUL 1 4 1998

| Month | Day | Year |

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

TITLE OF THIS WORK▼

108 YEARS OF NATIONAL GEOGRAPHIC MAGAZINE ON CD-ROM

NATURE OF THIS WORK ▼ See instructions

CD-ROM

PREVIOUS OR ALTERNATIVE TITLES▼

PUBLICATION AS A CONTRIBUTION If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.        Title of Collective Work▼

If published in a periodical or serial give:    Volume▼    Number▼    Issue Date▼    On Pages▼

**2**

**a**

NAME OF AUTHOR▼

NATIONAL GEOGRAPHIC SOCIETY

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire?"
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
     Domiciled in ▶ USA

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?  ☐ Yes  ☐ No
Pseudonymous? ☐ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

NOTE
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Check appropriate box(es). **See instructions.**
☐ 3-Dimensional sculpture
☐ 2-Dimensional artwork
☐ Reproduction of work of art
☐ Design on sheetlike material
☐ Map
* ☐ Photograph
☐ Jewelry design
☐ Technical Drawing
* ☐ Text        * introductory audiovisual
☐ Architectural work   montage

**b**

NAME OF AUTHOR▼

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire?"
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
     Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?  ☐ Yes  ☐ No
Pseudonymous? ☐ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Check appropriate box(es). **See instructions.**
☐ 3-Dimensional sculpture
☐ 2-Dimensional artwork
☐ Reproduction of work of art
☐ Design on sheetlike material
☐ Map
☐ Photograph
☐ Jewelry design
☐ Technical Drawing
☐ Text
☐ Architectural work

**3**

**a**

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED
1997 ◀Year
This information must be given in all cases.

**b**

DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month▶ JANUARY   Day▶ 1   Year▶ 1997
USA                                  ◀ Nation

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same author given in space 2▼
NATIONAL GEOGRAPHIC SOCIETY
WASHINGTON, DC 20036

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.

APPLICATION RECEIVED JUL 1 4 1998
ONE DEPOSIT RECEIVED JUL 1 4 1998
TWO DEPOSITS RECEIVED
REMITTANCE NUMBER AND DATE

DO NOT WRITE HERE
OFFICE USE ONLY

---

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.        • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___2___ pages

* Amended by CO per telephone conversation with Paul Kilmer, Esq., authorized agent of National Geographic Society , on February 1, 1999.

EXAMINED BY ____ JHL ____

CHECKED BY

CORRESPONDENCE
Yes

FORM VA

FOR COPYRIGHT OFFICE USE ONLY

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number▼        Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates.

COMPILATION OF PRE-EXISTING MATERIAL PRIMARILY PICTORIAL.

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed.

                    * audiovisual montage
BRIEF INTRODUCTORY ~~GRAPHIC MATERIAL~~

See instructions before completing this space.

**6**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.        Account Number ▼

NATIONAL GEOGRAPHIC SOCIETY                DA 044229

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip

SEE SPACE 9

Area Code & Telephone Number ▶    (202) 857-7490

Be sure to give your daytime phone number

**7**

**CERTIFICATION** I, the undersigned, hereby certify that I am the
Check only one ▼

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of    NATIONAL GEOGRAPHIC SOCIETY
           Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

ANGELO M. GRIMA          _Angelo M Grima_          date ▶    7-10-98

Handwritten signature (X) ▼

**8**

MAIL CERTIFICATE TO

Name ▼        SHEILA HOCKER

Number/Street/Apartment Number ▼
NATIONAL GEOGRAPHIC SOCIETY
1145 17TH STREET, NW – RM. 590

City/State/ZIP ▼
WASHINGTON, DC  20036

Certificate will be mailed in window envelope

• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable $20 filing fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO
Register of Copyrights
Library of Congress
Washington, D.C. 20559

**9**

17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

This form was electronically produced by Elite Federal Forms, Inc.

**EXCERPT FROM H.R. 94-1476 (1976)**
<u>reprinted in</u> **1976 U.S.C.C.A.N 5659**

Contributions to collective works

Subsection (c) of section 201 deals with the troublesome problem of ownership of copyright in contributions to collective works, and the relationship between copyright ownership in a contribution and in the collective work in which it appears. The first sentence establishes the basic principle that copyright in the individual contribution and copyright in the collective work as a whole are separate and distinct, and that the author of the contribution is, as in every other case, the first owner of copyright in it. Under the definitions in section 101, a 'collective work' is a species of 'compilation' and, by its nature, must involve the selection, assembly, and arrangement of 'a number of contributions.' Examples of 'collective works ' would ordinarily include periodical issues, anthologies, symposia, and collections of the discrete writings of the same authors, but not cases, such as a composition consisting of words and music, a work published with illustrations or front matter, or three one-act plays, where relatively few separate elements have been brought together. Unlike the contents of other types of 'compilations,' each of the contributions incorporated in a 'collective work' must itself constitute a 'separate and independent' work, therefore ruling out compilations of information or other uncopyrightable material and works published with editorial revisions or annotations. Moreover, as noted above, there is a basic distinction between a 'joint work,' where the separate elements merge into a unified whole, and a 'collective work,' where they remain unintegrated and disparate.

The bill does nothing to change the rights of the owner of copyright in a collective work under the present law. These exclusive rights extend to the elements of compilation and editing that went into the collective work as a whole, as well as the contributions that were written for hire by employees of the owner of the collective work, and those copyrighted contributions that have been transferred in writing to the owner by their authors. However, one of the most significant aims of the bill is to clarify and improve the present confused and frequently unfair legal situation with respect to rights in contributions.

The second sentence of section 201(c), in conjunction with the provisions of section 404 dealing with copyright notice, will preserve the author's copyright in a contribution even if the contribution does not bear a separate notice in the author's name, and without requiring any unqualified transfer of rights to the owner of the collective work. This is coupled with a presumption that, unless there has been an express transfer of more, the owner of the collective work acquires 'only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.'

The basic presumption of section 201(c) is fully consistent with present law and practice, and represents a fair balancing of equities. At the same time, the last clause of the subsection,

3

under which the privilege of republishing the contribution under certain limited circumstances would be presumed, is an essential counterpart of the basic presumption. Under the language of this clause a publishing company could reprint a contribution from one issue in a later issue of its magazine, and could reprint an article from a 1980 edition of an encyclopedia in a 1990 revision of it; the publisher could not revise the contribution publisher could not revise the contribution itself or include it in a new anthology or an entirely different itself or include it in a new anthology or an entirely different magazine or other collective work.